Argued December 11, 1945; affirmed January 29, 1946

## DAVIS *v.* LAVENIK

(165 P. (2d) 277)

Before BELT, Chief Justice, and KELLY, BAILEY, LUSK, BRAND and HAY, Associate Justices.

*Richard B. Maxwell,* of Klamath Falls (Farrens & Maxwell, of Klamath Falls, on the brief), for appellant.

*Arthur I. Moulton,* of Portland (Moulton & Davis, of Portland, and U. S. Balentine, of Klamath Falls, on the brief), for respondent.

BELT, C. J.

Dale Davis, a boy fifteen years of age, commenced this action, through his guardian ad litem, to recover damages for personal injuries sustained in a collision between a bicycle, which he was riding, and an automobile driven by the defendant. The accident occurred at about three o'clock in the afternoon of April 19, 1944, at the intersection of Alameda and Montclaire streets in Klamath Falls, Oregon. The plaintiff charged the defendant with negligence as follows: (1) Driving "without due, or any, circumspection." (2) Driving at a dangerous and high rate of speed. (3) Failing to keep a proper lookout. (4) Failing to yield the right of way. (5) Failing to drive on the right side of the street and intersection. The defendant denied the negligence

as charged and alleged affirmatively that the plaintiff was guilty of contributory negligence on substantially the same grounds as set forth in the complaint. On these issues, the cause was submitted to a jury and a verdict returned in favor of the plaintiff in the sum of $10,000. From the judgment based upon such verdict, the defendant appeals.

■■ The principal assignment of error is predicated upon the refusal of the court to allow the motions of the defendant for a judgment of involuntary non-suit and a directed verdict. In support of these motions, the defendant contends: (1) That there is no substantial evidence tending to show the negligence of the defendant in one or more particulars as alleged, and that such negligence was the proximate cause of the injury. (2) That the evidence shows, as a matter of law, plaintiff was guilty of contributory negligence. In considering such assignment of error, the plaintiff is entitled to the benefit of every reasonable intendment of the evidence, and a statement of facts of the case will therefore be made in the light most favorable to him. It is not the function of this court to review conflicting evidence, nor to substitute its judgment for that of the jury on a question of fact. The court has reiterated these fundamental legal principles so many times that citation of authorities is deemed unnecessary.

On the day of the accident, defendant, accompanied by his wife, was driving his automobile east on Alameda street. This street is 20 feet in width and has a curb on the north side thereof. It intersects at right angles with Monclaire street which runs in a general northerly and southerly direction, and is 40 feet in width. Klamath Union High School, which is attended by 1100 students, is on the east side of Monclaire street

and is about 200 feet from the intersection in question. Approximately 100 students ride bicycles to and from the school. A map introduced in the evidence shows that Monclaire street, from the intersection to the high school, has a "9.7% grade". The pavement on Alameda ends at the east line of the intersection, but such street continues, in the same general direction, as a dirt road.

Defendant had no intention of turning to the left on Monclaire, but had in mind going straight ahead on the dirt road en route to see his son. There is evidence that defendant entered this intersection—with which he and the plaintiff were thoroughly familiar—at a speed of 30 miles per hour. There is substantial evidence tending to show that the collision occurred on the north side of the center line of Alameda, although other evidence was to the contrary. Plaintiff testified positively he never at any time was on his left side of the center of Montclaire or Alameda streets. If such evidence is true—and for the purposes of this appeal, it must be so accepted—it follows that defendant was on the wrong side of the street when the collision occurred.

Plaintiff, after being excused from class, rode his bicycle down-hill on Monclaire street, about 2 or 3 feet to the right of center line of the concrete pavement. He says that he was traveling at a speed of about 10 miles per hour. The sun was shining and the pavement was dry. Plaintiff testified that when he was about 10 feet from the intersection he first saw the defendant, who was 30 feet back on Alameda, and was on the left, or wrong, side of such street. Plaintiff says that he had "pretty well" completed the turn to the right and was 7 or 8 feet from the north curb of Alameda before being struck by the automobile. Plaintiff said the

"left head-light or bumper hit the front end of my bicycle."

As a result of this head-on collision, the bicycle was practically demolished; the left front head-light and the glass of the windshield of the automobile were broken. Plaintiff was struck by the bumper of the car and thrown upon the hood and against the windshield with such force that his body went 3 feet in the clear over the top of the entire length of the car before falling to the pavement in about the middle of the intersection.

The defendant testified in substance that he looked to the left as he approached the intersection, but that he did not see the plaintiff "until he hit the car." There is a house on the northwest corner of the intersection enclosed by a four-foot picket fence which would obstruct the view somewhat, but it is clear from the evidence that the plaintiff and the defendant would have been in plain sight of each other from the time the plaintiff was 10 feet from the intersection and the defendant was 30 or 40 feet from it. The defendant testified that immediately after the collision the car moved 6 or 8 feet and then stopped. He said he "could not see a thing because both windshields were all just shattered to pieces", and that he got out of the car and discovered the "boy lying there on the pavement." Witnesses Jerry Watson and William L. Crumline, the latter being called by the defendant, testified, however, that the automobile did not immediately stop after the impact, but proceeded two or three car lengths beyond the intersection before it stopped on the right side of the dirt road. The width of the intersection is 40 feet. One witness testified that it was 92 feet from the point of impact to where the car stopped.

Jerry Watson, a boy about seventeen years of age and schoolmate of the plaintiff, said that, when he was about half-way across the street near the high school, he heard a "thud" and, looking down the hill toward the intersection, saw "a person in the air and a car directly behind him." Watson ran down to the scene of the accident to render what aid he could to plaintiff. He testified that the defendant, at such time and place, told him that "he saw whoever was hit as he hit the windshield, not before." In response to the question, "Did he state anything about what he was doing at the time and immediately prior to the collision", the witness answered: "He said that his wife was reading him a letter." Relative to the speed of the car, Watson said: "It was going very fast. * * * I would say it was doing over thirty miles an hour" and that it was "a little bit to the left of the center of Alameda." That is, "up the hill from the center line."

Glenn Inman testified that he met the defendant on the street on the day of the accident, and the latter told him how the accident had happened. Inman said that defendant told him his wife was reading a letter and he must have glanced over where she was reading the letter and that was possibly how it happened.

Allen H. Davis, father of plaintiff, testified about a conversation which he had with the defendant at the scene of the accident. Davis said he asked him how the accident happened, and the defendant said: "I do not know. I never saw the boy until he hit the windshield. I do not know where he came from." He told him his wife "* * * was reading a letter to him and said he must have been listening to her reading this letter and that he never saw the boy until he hit the windshield." Plaintiff's father also testified that he observed tire tracks in the dirt road, leading from the

edge of the pavement to the defendant's car for a distance of 65 feet. He said that if a line of these tire tracks was extended in the same direction it would intersect the north curb of Alameda approximately where the side-walk on the west side of Monclaire intersected Alameda. He further testified about finding shattered glass on the pavement about 3 feet from the curb on the northwest corner of the intersection and said that the glass extended beyond the center of the intersection.

W. E. Peck, a police officer who arrived at the scene of the accident about 20 minutes after it occurred, testified about observing a splotch of blood about in the center of the intersection where the boy was lying. He said that defendant's car was about 93 feet from a certain "scrape mark" 8 feet south of the curb on the north side of Alameda street. In describing the "scrape mark", he said it "was like a piece of metal, or tin, or something had scooped or scraped on the pavement." It was approximately 8 inches wide and 14 inches long. He observed no skid marks on the pavement.

■ In view of the above statement of facts, we think it is clear that there is some substantial evidence tending to show negligence on the part of the defendant in that he was driving at excessive speed on the left side of Alameda street and that he had failed to keep a proper look-out for traffic. Whether one or more of these specifications of negligence was the proximate cause of the injury was a jury question. We can not say, as a matter of law, that plaintiff was guilty of contributory negligence, as that issue was one for the jury to decide. We conclude that no error was committed in submitting the cause to the jury.

■ We see no merit in the contention that there is no competent evidence of speed. Appellant's objection

to the testimony of the plaintiff and Watson goes to the weight of their evidence and not to its admissibility.

■ Assuming that defendant had the right of way at the intersection, he was not relieved of the duty of exercising reasonable care in keeping a look-out for traffic. *Lane v. Hatfield,* 173 Or. 79, 143 P. (2d) 230; *Casto v. Hansen,* 123 Or. 20, 261 P. 428. The jury in the instant case might reasonably have inferred from the evidence, relative to the reading of the letter by defendant's wife, that the driver of the automobile was not keeping a proper look-out. None of the cases cited by appellant sustain the proposition that it would be proper for the court, under a similar factual situation, to declare, as a matter of law, that defendant was free from negligence.

■ Neither can this court say, as a matter of law, that the plaintiff did not ride his bicycle as required by § 115-334 O. C. L. A., "* * * as closely as practicable to the right-hand curb or edge of the highway." Whether plaintiff exercised due care in this respect was a question of fact for the jury. *Lott v. DeLuxe Cab Co.,* 136 Or. 349, 299 P. 303. We know, as a matter of common knowledge, that a person riding a bicycle can not make a turn at right angles in a street intersection. Neither does the law require him to do so.

■ Defendant contends that there is no casual connection between the "scrape mark" and the accident, and that the court erred in denying the motion to strike the evidence relative thereto. Plaintiff claims that such mark was caused by the metal rim of the bicycle after the tire had been torn therefrom as a result of the collision. The "scrape mark" was in close proximity to the shattered glass and the splotch of blood on the pavement. It was also at a point in direct line of the

tire marks of defendant's car as made on the dirt road. Furthermore, it was near the place where the plaintiff says he was struck by the automobile.

We think the jury should be permitted to draw a reasonable inference from such evidence that the collision occurred near where Peck said the "scrape mark" was located. It will be recalled that Peck was at the scene of the accident within 20 minutes after it occurred, and therefore his testimony is not objectionable as being too remote. Blashfield's Cyclopedia of Automobile Law, 9 Perm. Ed. (part 2) § 6179.

*Natwick v. Moyer,* 177 Or. 486, 163 P. (2d) 936, involved a head-on collision between two automobiles. Each party claimed that the other was driving on the wrong side of the road. Evidence was admitted as to certain debris on the pavement. Within 2½ feet of such substance there was a "freshly-made, deep indentation or cut in the pavement" which extended to the front wheel of one of the automobiles. The court held such evidence admissible, saying: "From these facts we think it would not be unreasonable for a jury to conclude that the collision occurred at about the point where the debris was observed * * *." We are not unmindful that this case is distinguishable somewhat on the facts from the one at bar, but we think the legal principles therein announced are nevertheless controlling here. Of course, if tire marks on the pavement had been observed in the instant case leading directly to the "scrape mark", a stronger inference as to the point of impact would be warranted than could here be reasonably made. We must not, however, concern ourselves with the weight of the evidence. Suffice it to say, a reasonable deduction from the evidence—considered in its entirety—could be made in this case as

to the point where the collision occurred. It was proper for the witness, Peck, to describe the physical conditions as he observed them. No evidence was received as to any deductions or conclusions of the witness. He merely testified as to what he saw.

Other assignments, relative to instructions of the court, are not deemed of importance and will be passed without discussion.

The judgment is affirmed.