Argued March 22, affirmed May 16; petition for rehearing denied
June 27, 1950

## COWGILL, Adm'r *v.* BOOCK, Adm'r

218 P. (2d) 445

In Banc.

*George H. Fraser,* of Portland, argued the cause for appellant. With him on the briefs were Hart, Spencer,

McCulloch, Rockwood and Davies, Hugh L. Biggs, and Manley B. Strayer, all of Portland.

*Orval N. Thompson,* of Albany, argued the cause for respondent. On the brief were Weatherford & Thompson, and Willis, Kyle & Emmons, all of Albany.

BELT, J.

This is an action to recover damages resulting from the death of Billie Eugene Parker, a minor seventeen years of age, alleged to have been caused by the gross negligence and intoxication of his father, the deceased George W. Parker, while driving a Plymouth pick-up truck on the South Santiam highway. The cause was submitted to a jury and a verdict returned in favor of the plaintiff-administrator in the sum of $5,000.00.

The defendant-administrator appeals, assigning error in the denial of the motions for a nonsuit and a directed verdict. It is defendant's contention that the action can not be sustained for the reasons: (1) An unemancipated minor child can not maintain an action against his parent for a personal tort. (2) There is no substantial evidence tending to show that the decedent-father was guilty of negligence, gross negligence or intoxication which was the proximate cause of the death of his son.

In view of the demurrer to the evidence, the statement of the facts will be made in the light most favorable to the plaintiff. It is elementary that plaintiff is entitled to the benefit of every reasonable intendment of the evidence. The defendant offered no evidence.

On August 14, 1945, the deceased George W. Parker resided with his wife and nine children at Madras in

eastern Oregon about nine miles north of Culver. He was a logger and for a few months prior to the accident had lived with his family at Sweet Home in western Oregon. The father, accompanied by his brother and his son Billie, drove from his home at Madras to Culver, where his friend Bert Clayton operated a tavern. It was "V. J. Day" and they were celebrating. Clayton refused to sell the father any beer because the latter was intoxicated to such an extent that he staggered and had some "difficulty controlling his movements"; his eyes were bloodshot; and he was "thick tongued." Upon the refusal of Clayton to sell him beer, Parker became angry and said: " 'I don't have to drink your beer; I have two quarts of whisky in the car.' " Parker and his brother went to the car and proceeded to drink whisky. They finished the "little bit" in the one-fifth bottle and then opened the second one. Clayton said George Parker and his brother had three drinks of whisky. The son Billie did not drink. George Parker wanted his friend Clayton to go to Sweet Home with him but he refused. According to the witness Clayton, Billie told his father that he did not want to go to Sweet Home, but the father said: " 'Billie, you are going; get in the car.' " Billie wanted to drive but his father said: " 'No, I will do the driving of this car; you get in on the other side.' " Mrs. Bertha Clayton testified that she heard George Parker say that he was going to Sweet Home and that he asked her husband to go with him. She said that the boy asked "if he couldn't stay with us. He didn't want to go with his father." She heard the father say to Billie: " 'You are going with me.' " Mrs. Clayton also testified that George Parker and his brother were both "quite intoxicated" but that Billie did not have a drink.

The Parkers left Culver about 9:30 o'clock in the evening for Sweet Home on the west side of the Cascade mountains. The father was driving, his brother was in the middle, and Billie was on the right side of the seat. This was the last time they were seen alive.

Three days later the deputy coroner of Linn county and a State Police officer found their bodies in the overturned pick-up truck partly submerged in the water of the South Santiam river five miles east of Upper Soda and about one hundred miles from Culver. The car had gone over an almost perpendicular bluff 120 feet high. When the body of George Parker was removed from the car, it was on the left side of the seat; the body of the brother was in the middle; and the body of Billie was on the right side of the seat. It will be recalled that this was the same position in the car that they were in when they left Culver. The watch in the father's pocket—which was under water—had stopped at 12:10. A bottle of whisky about one-half full was found in the car. The coroner, after having qualified as an expert witness, testified that in his opinion the bodies had been dead at least two days.

Mr. Wayne Huffman, a State Police officer who was with the coroner and investigated the wreck, testified that the accident occurred on a downhill "S" curve in the mountainous section of the highway, which ran in an easterly and westerly direction. The officer testified that the vehicle had run on the shoulder on the north side of the highway for a distance of 50 feet and then went into a small drainage ditch where it traveled for 100 feet and up against the side of a high bank. After leaving the ditch, the vehicle skidded for a distance of 86 feet diagonally across the dry pavement. The officer stated that at the end of the "86 feet

of skidmarks," there were "gouge marks" in the pavement indicating that the vehicle had rolled over for a distance of 45 feet before it went "down the bank and into the river." Two tires were "deflated."

It is alleged in the complaint that the decedent George W. Parker "became grossly intoxicated and wholly incompetent to drive an automobile and did by invitation, threat, and command, induce and coerce his said son, Billie Eugene Parker, to enter an automobile" and accompany him over the Santiam highway to Sweet Home. It is further alleged, in substance, that while the decedent George Parker was in such drunken condition, he continued to drive the car "upon a dangerous and curved highway" at a high and dangerous rate of speed and without having it under control. It is further alleged that such negligence was the proximate cause of the death of Billie Eugene Parker.

 This action was brought under the Wrongful Death Statute, § 8-903, O. C. L. A. At common law there was no remedy by way of a civil action for the death of a human being, and a cause of action arising out of an injury to a person died with the person. *McClaugherty v. Rogue River Electric Co.*, 73 Or. 135, 140 P. 64, 144 P. 569; *Perham v. Portland Electric Co.*, 33 Or. 451, 53 P. 14, 40 L. R. A. 799. The purpose of the statute was to give redress for an injury where none existed at common law. The statute created a new right of action for wrongful death with the limitation, "* * * if the former [decedent] might have maintained an action, had he lived, against the latter [wrong-doer], for an injury done by the same act or omission." If the decedent Billie Parker could have maintained an action, had he lived, against his father for an injury "done by the same act or omission," then the present action will

lie; otherwise, it can not be maintained. *Perham v. Portland Electric Co.*, supra; 16 Am. Jur., Death, 61, § 82. In view of this statutory limitation, we must test the instant cause by the same legal principles that would have been applicable if Billie Parker, had he lived, brought an action against his father for personal injuries caused by gross negligence or intoxication as alleged in the complaint. In other words, if we assume that this minor child was maimed or crippled for life as a result of the gross negligence or intoxication of the father, as shown by the evidence in this case, could the action be maintained?

■ There is some substantial evidence to support the allegations of gross negligence and intoxication. When George Parker in his drunken condition drove this automobile, he was engaged in an unlawful act and had utter disregard not only for his own safety but for the safety of those who were riding with him. Section 115-318, subd. (a), O. C. L. A., provides:

> "It shall be unlawful * * * for any person * * . * who is intoxicated or under the influence of intoxicating liquor * * * to drive any vehicle upon any highway, street or thoroughfare within this state."

Subd. (c) provides:

> "If the death of any human being shall be caused by the negligent operation of any vehicle contrary to this act by any person while intoxicated or under the influence of intoxicating liquor or narcotic drugs, such operator of such vehicle shall be deemed guilty of manslaughter and, upon conviction, shall be punished as provided by existing law relating to manslaughter."

In *State v. Lockwood*, 126 Or. 118, 268 P. 1016, the defendant was charged with involuntary manslaughter on

account of her having killed a pedestrian while driving an automobile when intoxicated. She denied any knowledge of having struck the young boy whom she killed, yet the conviction was sustained.

■■■ This case is just another example of a terrible tragedy resulting from the excessive use of intoxicating liquor while driving an automobile. Of course, the father did not actually intend to kill his son, but he was nevertheless responsible for the consequences which flowed from his wrongful act. It is presumed that a person intends the ordinary consequences of his voluntary act. The father knew or ought to have known of the danger in driving at a high speed at nighttime over this mountainous highway when he and his brother were both drunk. The boy no doubt realized the danger of riding with his father under the circumstances. It was against his will to get into the car, but he did so in obedience to his parent. He had good reason to stay with the Claytons at Culver, but the drunk father arbitrarily compelled him to go.

■■ Defendant-appellant concedes that there is evidence of intoxication, but contends that it is entirely speculative from the evidence as to what caused the car to leave the highway and plunge down the steep embankment into the river. More specifically, defendant asserts that there is no evidence that the decedent-father was driving the car at the time of the accident or that he was guilty of negligence or intoxication which was the proximate cause of the death of Billie Parker. We can not agree with this contention. The skid marks and course of the car plainly speak of excessive speed and loss of control of the car. The position in which the bodies were found would indicate that the father was driving the car when it went over the bank. It is

also reasonable to assume that the Parkers, when they left Culver at 9:30 in the evening, were enroute to Sweet Home in view of the decedent's request that his friend Clayton accompany him to such place. The stopping of the watch at 12:10 is some evidence that the distance of 100 miles to the place of the accident was, under the circumstances, traveled at a high rate of speed. It is not necessary to establish a cause of action by direct evidence. Negligence may be inferred from the facts and circumstances surrounding an accident. *White v. Keller et al.*, 188 Or. 378, 215 P. (2d) 986; *Davis v. Lavenik*, 178 Or. 90, 165 P. (2d) 277; *Natwick v. Moyer*, 177 Or. 486, 163 P. (2d) 936; *Greenslitt v. Three Bros. Baking Co., Inc.*, 170 Or. 345, 133 P. (2d) 597.

We are not impressed with the argument that the evidence of intoxication prior to the happening of the accident is too remote. If George Parker was quite drunk at Culver, it is a reasonable inference that he was still drunk at the place of the accident, in view of the fact that the whisky bottle found in the overturned car was only half full. There was also an empty beer bottle in the car. It is entirely reasonable to infer that the celebration was still on!

It is also suggested that the loss of control of the car as evidenced by its course on the shoulder of the highway and in the ditch might have been due to the effort of the driver to avoid striking an animal or a vehicle on the road, or that the driver might have been temporarily blinded by the lights of an approaching vehicle, or that a mechanical defect in the vehicle itself was the cause of the accident. We are aware of the well established rule that negligence can not be predicated upon mere conjecture, guesswork or speculation. *Simpson v. Hillman*, 163 Or. 357, 97 P. (2d)

527. It is elementary that where evidence shows two or more equally probable causes for injury, for not all of which defendant could be responsible, no action for negligence will lie. However, in the instant case there is no evidence of an animal being on the highway, that the driver was blinded by lights, or of any mechanical defect in the vehicle. Reasonable inferences must be drawn from the evidence. There is evidence of intoxication and it is far more probable that such was the proximate cause of the accident than that it was due to any of the possible causes suggested by the defendant. We are concerned with probabilities and not possibilities. It is not necessary to establish proximate cause with certainty. A jury question is presented if there is substantial evidence tending to show the probable cause of the injury.

 It was cruel for the father to order his son to ride with him under the circumstances. In our opinion the decedent-father was guilty of wilful misconduct. The Supreme Court of California in *Parsons v. Fuller*, 8 Cal. (2d) 463, 66 P. (2d) 430, quoted with approval from *Norton v. Puter*, 138 Cal. App. 253, 32 P. (2d) 172, 174, which defined wilful misconduct as follows:

"Willful misconduct depends upon the facts of a particular case, and necessarily involves deliberate, intentional, or wanton conduct in doing or omitting to perform acts, with knowledge or appreciation of the fact, on the part of the culpable person, that danger is likely to result therefrom." Citing numerous authorities.

The court further stated in the Parsons case that:

" '* * * one who, while driving an automobile, knowingly flirts with danger and, without necessity or emergency compelling him, "takes a chance" on killing or injuring himself and others,

who may be so unfortunate as to be riding with him, is guilty of willful misconduct.' "

In *Durgin's Case,* 251 Mass. 427, 430, 146 N. E. 694, the court said:

"Negligence and serious and wilful misconduct are entirely different in kind. The latter 'involves conduct of a *quasi* criminal nature, the intentional doing of something either with the knowledge that it is likely to result in serious injury or *with a wanton and reckless disregard of its probable consequences.*' " (Italics ours.)

In the instant case, the father in driving the automobile while drunk was engaged in an unlawful act. We are concerned here with a case involving more than ordinary or gross negligence. It is one of wilful misconduct of the father whose wrongful act resulted in the untimely death of his young son. The wrongful conduct of the father in driving the automobile while drunk is in no way referable to his duties as a parent. Indeed, in this case there was a clear abandonment of the parental duty.

Does public policy forbid maintenance of the action? Whether an unemancipated child can recover against his parent for a personal tort is a new question in this state. The question was first decided in this country in 1891 in *Hewellett v. George,* 68 Miss. 703, 9 So. 885, 13 L. R. A. 682. In that case a mother wrongfully and maliciously caused her minor child to be confined in a hospital for the insane. The court without citing any authority or considering the historical background of the nonliability theory held that no recovery could be had for the reason that to permit such an action would violate public policy. The court stated:

"But so long as the parent is under obligation to care for, guide, and control, and the child is under

reciprocal obligation to aid and comfort and obey, no such action as this can be maintained. The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. The state, through its criminal laws, will give the minor child protection from parental violence and wrong-doing, and this is all the child can be heard to demand.''

*Hewellett v. George,* supra, was followed by *Mc-Kelvey v. McKelvey,* 111 Tenn. 388, 77 S. W. 664, 64 L. R. A. 991, 102 Am. St. Rep. 787, decided in 1903, which held that a father who had brutally beaten his minor child was, on account of public policy, immune from liability for the personal injury sustained, following the reasoning of the Mississippi decision.

In 1905, *Roller v. Roller,* 37 Wash. 242, 79 P. 788, 68 L. R. A. 893, 3 Ann. Cas. 1, 107 Am. St. Rep. 805, an extreme decision, was rendered precluding recovery against a father who had raped his minor daughter. The basis of this decision was that it would be against public policy to permit such an action to be maintained. It is absurd to talk about maintaining the peace and tranquillity of the home when it had thus already been disrupted by such a monstrous crime. Concerning this case, Harper, Torts, 626, § 285, said:

"To deny a recovery in damages to a daughter against a father who has been convicted of raping her on the ground that it would tend to disturb the beauty, tranquility, and sanctity of that home is nothing short of absurdity."

In the last three cases cited, the courts, without referring to any authorities, stated that at common

law such actions could not be maintained. There is some authority, however, that at early common law a parent was liable to his child for a personal tort. *Dunlap v. Dunlap,* 84 N. H. 352, 150 A. 905, 71 A. L. R. 1055; *Briggs v. Philadelphia,* 112 Pa. 50, 170 A. 871; Prosser, Torts (Hornbook series) 905, § 99; 18 B. U. L. Rev. 468; 7 Fordham L. Rev. 459. See the following English authorities on the subject: 2 Addison, Torts (4th ed.) 727; Eversley, Domestic Relations (4th ed.) 571; Pollock, Torts (12th ed.) 128. In *Fidelity & Casualty Co. v. Marchand* (1924) 4 D. L. R. 157, 166, the Canadian court permitted recovery "however repugnant it may seem that a minor child should sue his own father" but stated that it was "equally repugnant that a child injured by his father's negligent act, perhaps maimed for life, should have no redress for the damages he has suffered."

■ Whatever may be the early common rule, we should not be bound thereby unless it is supported by reason and logic. The law is not static. It is a progressive science. What may have been a wholesome common law rule a hundred years ago may not be adapted to the changed economic and social conditions of this modern age. In *Rozell v. Rozell,* 281 N. Y. 106, 112, 22 N. E. (2d) 254, 123 A. L. R. 1015, it is said:

"The genius of the common law lies in its flexibility and in its adaptability to the changing nature of human affairs and in its ability to enunciate rights and to provide remedies for wrongs where previously none had been declared."

After *Hewellett v. George,* supra, was decided, there was built up in this country a mass of authority supporting the nonliability rule. 31 A. L. R. 1157; 71 A. L. R. 1071; 122 A. L. R. 1352. Many of these

decisions stem from the Mississippi decision which, in our opinion, was wrongly decided and resulted in a miscarriage of justice. It is observed that many of the courts that have considered this question have adhered to the hard and fast rule of nonliability regardless of the character of the tort or the difference in the factual situations involved.

It is only in comparatively recent years that dissenting voices have been raised in criticism of adhering to an absolute rule which in some instances has resulted in a denial of justice. *Dunlap v. Dunlap,* supra; *Wells v. Wells* (Mo. App.) 48 S. W. (2d) 109; vigorous dissent of Chief Justice Clark in *Small v. Morrison,* 185 N. C. 577, 118 S. E. 12; and that of Justice Crownhart in *Wick v. Wick,* 192 Wis. 260, 212 N. W. 787, 52 A. L. R. 1113. In *Sorrentino v. Sorrentino,* 248 N. Y. 626, 162 N. E. 551, the court without a written opinion, by a four-to-three decision — Chief Justice Cardozo and Justices Crane and Andrews dissenting—held that an action for personal injuries resulting from negligence could not be maintained against a parent by an unemancipated minor child. In the latter decision of *Cannon v. Cannon,* 287 N. Y. 425, 429, 40 N. E. (2d) 236, the Court of Appeals followed the Sorrentino decision, but it was careful not to commit itself to an absolute rule of nonliability. The court significantly stated:

> "In the absence of statutory sanction, we are not prepared, in cases where wilful misconduct by the parent is not a factor, to inject the disruptive risk of tort liability between parents and their unemancipated children * * *."

There is a strong implication that if "wilful misconduct" is involved, the action will lie. See *Meyer v.*

*Ritterbush,* 92 N. Y. S. (2d) 595, 196 Misc. Rep. 551, decided September 27, 1949.

There is a trend of modern decisions to depart from the general rule of nonliability where the injury sustained by an unemancipated minor child is the result of a wilful or malicious tort. In 39 Am. Jur., Parent and Child, 736, § 90, it is said:

> "However, the rule, despite the long line of authorities supporting it, has been subjected to considerable criticism in some of the more recent decisions, and the tendency seems to be to repudiate or modify it whenever its application is found to be out of line with modern conditions."

In our opinion, the rule should not be considered as an absolute one. As stated in the well considered case of *Lusk v. Lusk,* 113 W. Va. 17, 19, 166 S. E. 538: "* * * we must not exalt this rule above ordinary common sense."

Legal writers have complained against the rule as applied to all factual situations in tort actions between a minor child and his parent. 18 B. U. L. Rev. 468; 18 Chi-Kent Rev. 211; 28 Geo. L. J. 430; 26 Geo. L. J. 139; 43 Harv. L. Rev. 1030; 1 U. of Newark L. Rev. 97; 79 U. of Pa. L. Rev. 80. Text writers are also critical of the rule. In the interests of brevity we refer to the exhaustive and instructive article on "Torts Between Persons in Domestic Relation" in 43 Harv. L. Rev. 1030, by Professor McCurdy relative to the authorities, which he states are "meager, conflicting, and obscure."

We appreciate full well that it is a wholesome rule and that it should be the policy of the law to preserve and maintain the security, peace and tranquillity of the home, which indeed is the very foundation upon which our government rests. It is unthinkable that a parent, while acting within the scope of domestic re-

lations, should be brought into court to defend against every unintentional personal tort that might be committed against a minor child. It is common knowledge that a parent, in order to maintain discipline and the quiet and peace of the home, is, in the ordinary course of human events, occasionally obliged to administer reasonable corporal punishment to a minor child. However, if from wicked motives a parent should brutally beat his minor child and thus maim him for life, are we to say that he should be immune from liability merely by reason of his parenthood? Is the welfare of society or a wholesome public policy subserved by granting immunity to a parent guilty of such brutality?

Chief Justice Peaslee, in an able opinion in *Dunlap v. Dunlap,* supra, after reviewing the authorities on the highly controversial question involved herein, stated:

"It is conceded of course that parental authority should be maintained. To this end, it is also conceded that the parent should not ordinarily be accountable to the child for a failure to perform a parental duty, and that vindication of personal rights should not be conceded to the child if it would impair the discharge of such duties. Thus far the reasons commonly denominated public policy carry the argument. For mistaken judgment as to the extent of chastisement, or for negligent disrepair of the home the father provides, there is usually no liability. These acts all grow out of and pertain to the relation of parent and child. The relation gives rise to the duty alleged to have been violated. Matarese v. Matarese, 47 R. I. 131.

"But there may be acts which clearly are not to be referred to such relation. The father who brutally assaults his son or outrages his daughter, ought not to be heard to plead his parenthood and the peace of the home as answers to an action seek-

ing compensation for the wrong. The relation is rightly fortified by certain rules. Outside that relation, the rules are inapplicable; and any attempt to apply them leads to irrational and unjust results."

Professor William L. Prosser, an eminent authority on torts and now Dean of the School of Jurisprudence at the University of California, in his Hornbook series on Torts at page 897, says:

"Few topics in the law of torts, in view of modern economic, social and legislative changes, display in their treatment greater inconsistency and more unsatisfactory reasoning."

He further states at page 906:

"The courts which deny the action have relied heavily on the analogy of husband and wife, which seems quite inapplicable because of the difference in the common law concept of the relations, and the absence of statutes to be construed. In addition, they have invented much the same variety of unconvincing reasons as in the case of the marital relation. The danger of 'fraud' has been stressed, although it is difficult to see why it is any greater, as between the parties themselves, than in any other tort action involving an infant; and likewise the possibility that the defendant might inherit the amount recovered in case of the plaintiff's death, or that the family exchequer might be depleted at the expense of other children—neither of which reasons seems to outweigh the desirability of compensating the injured one for his damage. But again, as in the case of husband and wife, the chief reason offered is that domestic tranquillity and parental discipline and control would be disturbed by the action—and again on the theory that an uncompensated tort makes for peace in the family and respect for the parent, even though it be rape or a brutal beating, and even though the relation itself has been terminated by death before the suit."

Various reasons have been given by the courts for adhering to the general rule of nonliability in tort actions by a minor child against a parent, but the basic reason is that it subserves public policy to do so. It is universally held that an unemancipated minor child can recover against his parent for breach of contract or violation of property rights. A wife—who is now on the same legal plane as her husband—may sue the latter for a personal tort. An action in tort was maintained in *Rozell v. Rozell,* supra, by a minor brother against his minor sister—both of whom were living in the same household. An emancipated minor child can sue his parent for a personal tort. It would seem as a practical matter that the above analogous actions would disturb the peace and tranquillity of the home as much, if not more than the instant action. What could be more disruptive and disturbing to the family relationship than a suit by an unemancipated minor child against his father for breach of trust? If the judgment in this action is sustained, the mother under the law of descent and distribution would inherit the money paid to the estate of her son. There is no reason to believe that the satisfaction of the judgment will result in depletion of the family exchequer. Neither do we think that strained family relations would follow by reason of the prosecution of this action.

In *Minkin v. Minkin,* 336 Pa. 49, 7 A. (2d) 461, a minor child eight years of age brought an action under the death statute of that state against his mother to recover for the death of his father alleged to have been caused by her negligent driving of an automobile. In the lower court judgment for defendant was entered on a statutory demurrer, but on appeal the Supreme Court of Pennsylvania reversed the judgment and re-

manded the cause for further proceeding. On appeal it was held that the death statute was "a declaration of public policy on the subject and necessarily displaced any policy to the contrary, if, in fact, it existed." The dissenting opinion of Justice Schaffer stated that he was "unable to agree with the conclusion of the majority that an unemancipated minor can maintain a tort action against his parent."

In *Munsert v. Farmers' Mutual Automobile Insurance Co.*, 229 Wis. 581, 585, 281 N. W. 671, 119 A. L. R. 1390, it was held that a parent may bring an action against an unemancipated minor child whose negligence caused the death of another unemancipated minor child, both of whom were living in the same home. Construing the Wrongful Death Statute of that state, the court said:

> "However it may be as to other actions in tort, we hold that under the death-by-wrongful-act statute the instant action which is under that statute might have been maintained by the parents directly."

After a careful consideration of the authorities, we think the general rule—so well established by the authorities—should be modified to allow an unemancipated minor child to maintain an action for damages against his parent for a wilful or malicious personal tort. The evidence in the instant action certainly shows that the decedent-father was guilty of wilful misconduct. Ordinary negligence or the doing of an unintentional wrong can not be the basis for such an action. To apply a hard and fast rule of nonliability to the facts in this case would, in our opinion, defeat justice and not subserve a sound public policy. What we have said in reference to public policy applies as well had the action been maintained during the lifetime

of the decedent minor child. By the wrongful conduct of the father in overstepping the bounds of the family relationship, the peace, security and tranquillity of the home had already been disrupted. When the reason for the rule ceases, the rule itself ceases.

The judgment is affirmed.

## ROSSMAN, J., SPECIALLY CONCURRING.

The law is a human institution fashioned, not by some superior being, but by the mind of man, and intended to serve human needs. Such being its nature, it can always be changed in order to adapt it to the service of justice. The development of the common law is the story of the constant efforts of the courts to find principles applicable to specific cases, only to discover later that the principle applied yesterday in a case, if applied today in the instant one, will produce injustice. Much of the development of the common law has consisted of first stating general principles and then, in later cases, of restating the principle or carving out of it exceptions to fit the needs of new cases. When a court states a principle, it has in mind a specific case and is unable to foresee clearly what lies ahead. If a general principle is used indiscriminately in situations that later develop, it may fail to yield justice. Society is not static and conduct is in a continuous state of flux. Mankind is constantly altering the social value it places upon different phases of life. The law must keep pace with life and develop with the expanding enlightenment of the age.

The sweep of the rule announced in *Hewellett v. George,* 68 Miss. 703, 9 So. 885, 13 L. R. A. 682, is all-inclusive. But the present case is by no means a facsimile of that one. If the rule employed in that

case must be applied in this one, the result will be an absurdity, for if recovery is denied under a belief that we will thereby preserve the tranquillity of the home and the authority of the father over his son, we are met with the solemn fact that both father and son are dead. The father's last act of control over his son took the life of both. We cannot restore them to life so that the father can again exercise dominion over his son. A denial of liability in this case will not preserve the peace of the home and the authority of a father. It will render obeisance to the general rule, it is true, but any rule which demands the sacrifice of justice in order that it may hold sway as a universal rule is unworthy of a place in our law.

Possibly it is difficult to state the basic rule which the Mississippi court had in mind in such a manner that recovery will be denied in all instances in which damages should not be allowed, and yet grant recovery in the occasional case, like the present, in which damages should be granted. But the mere fact that it is hard in any case to formulate a rule applicable to all future cases constitutes no justification for doing an injustice to a litigant who has a righteous one. The dissenting opinions manifest fear of future consequences if the rule of non-liability is deprived of its status as a universal one. They foresee confusion. One is reminded of the ejaculation uttered by the eighteenth century jurist when it was proposed that a litigant be permitted to amend his pleadings. That early jurist exclaimed, ''Think of the state of the record.'' Notwithstanding his fears, provision was made for amendments to pleadings, and no one would think today of retreating to the former practice. Allowing recovery in the instant case will cause no confusion.

The opinion written by Mr. Justice Belt recognizes the following exception to the general rule: If the death of a son results from a willful tort committed by the father, recovery can be had. It does not hold that the tort must have been a malicious one. The exception is criticized on the ground that the father, in the present case, did not intend to kill his son. Of course, he did not intend to do so, but the rule imputes to the father the natural consequences of his willful tort. Suppose, for example, that before the father went upon the fateful trip he had willfully stripped his car of its brakes and thereby had put it beyond his power to stop his car, all would agree that he should be charged with the natural results of his act.

It is safe to assume that when the Mississippi court held, in the Hewellett decision, that the daughter could not sue her mother [both were living], it did not visualize this case. In all likelihood, the justices who wrote the Hewellett decision would have been more circumspect in the use of words had they foreseen that their decision would be cited sixty years later by an appellant as authority for a holding that when a father, through the excessive use of liquor, destroys not only his son's life but his own, no action for redress can be maintained.

When the rule of non-parental liability is applied in instances of injury inflicted while the parent was discharging his duties as parent, the result of no liability is just and promotes a wholesome purpose. Thus, the parent should not be held liable for chastisement which he administered as head of the household; and a system of jurisprudence which recognizes congressional immunity from slander should experience no difficulty in recognizing that a child should not be permitted to hold

a mother or a father accountable in a slander action for words spoken by either in administering a rebuke. Likewise, the father should not be suable by his child for an injury sustained through the disrepair of the home, even though the father was negligent. Since parenthood places grave responsibilities upon father and mother, and since society must entrust much to the parents' discretion, it is not difficult to justify a parental mantle of immunity. Undoubtedly wrongs will occasionally be done under the mantle, but if the latter is not recognized and if every child can sue his parents for real or fancied wrongs, the intolerable situation resulting therefrom would be far harder to bear than the occasional wrong hidden by the mantle. The ultimate result to the child and to society resulting from non-liability is good.

Immunity is accorded the parent, not because he is a parent, but because, as a parent, he pursues a course within his household which society exacts of him and which is beneficial to the state. Society expects parents to keep the home in order, to preserve within it domestic tranquillity, to see to it that the children go to school and that they deport themselves properly in the neighborhood. The parental non-liability is not granted as a reward, but as a means of enabling the parents to discharge the duties which society exacts.

No immunity from liability is universal and independent of attendant circumstances. For instance, the man on the bench is not liable for his judicial conduct even if the latter is erroneously performed, but when he casts aside his judicial robe he likewise casts aside his immunity from liability. The doctrine of ultra vires is another example of the manner in which immunity operates as a shield only so long as the function is per-

formed which the law contemplated when the shield was given. Accordingly, it would be remarkable if the mantle of parental non-liability shields a father while dealing with his son in a non-parental transaction, or while committing an act which would not be tolerated even if committed by a stranger.

The proposition just stated has won recognition in cases involving liability in the parent-child relationship. For instance, in the carefully reasoned decision entitled *Dunlap v. Dunlap,* 84 N. H. 352, 150 Atl. 905, 71 A. L. R. 1055, the court said:

> "A father who brutally assaults his son or outrages his daughter ought not be heard to plead his parenthood and the peace of the home as answers to an action seeking compensation for the wrong. The relation is rightly fortified by certain rules. Outside that relation the rules are inapplicable. * * * The law does not make fetishes of ideas. It limits them to their proper spheres."

In that case, an unemancipated son, who became his father's employee during the school vacation period, was injured while at work. The court held that the son could maintain his tort action. The decision said:

> "The present suit is not for an intentional wrong, but for a negligent one, growing out of the relation of master and servant. As to this employment the father had intentionally surrendered his parental control."

It held that he also surrendered his parental immunity from suit. Another which adopted that line of reasoning is *Wood v. Wood,* 135 Conn. 280, 63 Atl. 2d 586. In 39 Am. Jur., Parent and Child, § 90, p. 735, in referring to the doctrine of non-liability, it is said:

> "In any event, it is inapplicable where there is a master and servant relation between the parent and child."

Further, when a father lays aside his parental role and enters into business transactions with his child, the latter can sue him. In that connection, it is stated in 39 Am. Jur., Parent and Child, § 88, p. 734:

"Thus there is no question but that a suit may be maintained between a parent and child with respect to contracts, wills, or other property rights."

The deplorable and much-criticized result which was reached in *Roller v. Roller*, 37 Wash. 242, 79 P. 788, 68 L. R. A. 893, 3 Ann. Cas. 1, 107 Am. St. Rep. 805, would have been avoided had the court recognized that the mantle of non-liability is available only when the father injures his child while discharging a parental duty, and is not available when he casts aside his role as parent. In that case, the father raped his minor daughter.

In the instance before us, the lamentable death occurred after the father had indulged excessively in strong liquor. When he arrived at the tavern of a friend, unsteady upon his feet and experiencing difficulty with his tongue, he applied for more beverages which he wished to quaff. His friend called his attention to his drunken condition and refused to supply the beverages which he sought to purchase. Thereupon the father resorted to a supply of whisky which he carried in his car, and presently ordered his son to get into the car.

The question that confronts us is whether the father was acting in his capacity as parent when he took the course which brought death to himself, to his son and to his brother. Before solving the problem, let us suppose that a father, while drunk, brutally beats his daughter, or, seizing a gun, shoots her. Should we say that in acting in such a drunken manner he was

exercising a parental function, or would it not be more in keeping with the enlightened views of the day to declare that his drunken action was outside the scope of his parental prerogatives. To hold that such drunken action is within the scope of parental authority would outlaw the child and close all courtrooms to her. Surely public policy does not demand such a holding. To the contrary, it requires a holding that an injury inflicted upon an unemancipated child by the father while in a drunken condition is not within the scope of parental authority. The conduct of the father while at the tavern and his subsequent drunken driving were not parental in nature. They were, in truth, violations of the father's duty to his son. The mantle of parental non-liability was never intended for a case such as this.

I concur in Mr. Justice Belt's opinion and amplify my reasons in the above manner.

LATOURETTE, J., specially concurring.

I concur in the opinion of Mr. Justice Belt because I believe that the reason for the rule of public policy in actions of this nature ceases to exist in so far as the facts in this case are concerned. The public policy doctrine is a wholesome one, in most cases involving torts between a father and his unemancipated son, but in the case at bar, it seems to me that when the drunken father commanded his son to ride with him on the fateful night and refused the son's request to let him drive the automobile and went careening down the road in the manner indicated, being engaged in an unlawful act and bringing about the son's untimely death, the harmony and tranquillity of the family unit then and there became emasculated. Cessante ratione legis, cessat et ipsa lex.

The courts universally hold that an unemancipated son has a right of action against his father for misappropriation of the son's property entrusted to the father. To reverse the judgment in this action, in the light of the facts, would be placing "property rights" over human rights. To this doctrine, I can not subscribe.

LUSK, C. J., dissenting.

The rule that an unemancipated minor child may not maintain an action for a personal tort against his parent has, since it was first announced in 1891 by the Mississippi Court in *Hewellett v. George,* 68 Miss. 703, 9 So. 885, 13 L. R. A. 682, received the judicial approval of nearly every court which has had occasion to pass on the question. As the opinion of the majority discloses, however, this rule has been vigorously attacked by dissenting judges and legal scholars as unreasonable, unjust and inconsistent. And some courts have refused to apply it to cases where, under the particular circumstances, it was thought that the reason for the rule, namely, the public policy which seeks to preserve the peace and harmony of the home, did not exist; or have indicated by way of dictum that its application should thus be limited. Thus, for example, in *Dunlap v. Dunlap,* 84 N. H. 352, 150 Atl. 905, 71 A. L. R. 1055, the court said obiter that in the case of "malicious injuries" abandonment of the parental relation should be implied. *Cannon v. Cannon,* 287 N. Y. 425, 40 N. E. (2d) 236, indicates a similar view.

In the present case the court adopts the immunity rule. In that I agree. But the Court says, nevertheless, that the present action may be maintained because "the decedent-father was guilty of wilful misconduct"; that "the rule should be modified to allow an un-

emancipated minor child to maintain an action for damages against his parent for a wilful or malicious personal tort''; and that ''By the wrongful conduct of the father in overstepping the bounds of the family relationship, the peace, security and tranquillity of the home had already been disrupted.''

I assume that the Court intends to lay down a rule, and not to make a special instance decision. Except for the use of the word ''malicious'' in the sentence heretofore quoted from the Court's opinion, the reasons assigned for making an exception of this case seem to me to be inadequate attempts to draw a line for this class of cases. If the evidence justified the belief that the conduct of the father was in fact malicious I might be able to go along with the majority, for the word ''malicious'' means ''harboring malice, ill will, or enmity; having a deliberate intention to injure others; intending or determined on evil''. Funk & Wagnall's New Standard Dictionary. In such a case a valid argument might be made that the peace of the family had already been disrupted. But the evidence does not show that the father had any ill will or enmity towards his son or that he intended to injure him any more than he intended to injure himself. However reprehensible his conduct may have been, it was not inspired by malice.

A ''wilful tort'' does not connote intent to injure anyone. Doubtless, it means the same thing as ''wilful misconduct'', which, as shown by the authorities cited in the opinion of the majority, ''necessarily involves deliberate, intentional, or wanton conduct in doing or omitting to perform acts, with knowledge or appreciation of the fact, on the part of the culpable person, that danger is likely to result therefrom.'' *Parsons v.*

*Fuller,* 8 Cal. (2d) 463, 66 P. (2d) 430. It includes "reckless disregard of the rights of others" (*Durgin's Case,* 251 Mass. 427, 430, 146 N. E. 694, cited by the majority) in the operation of an automobile, for which, under our statute, the owner or operator is liable to his guest. § 115-1001, O. C. L. A. It includes "gross negligence", as used in the same statute, which this court has defined as an "I-don't-care-what-happens mental attitude". *Lee v. Hoff,* 163 Or. 374, 390, 97 P. (2d) 715, quoted with approval in *Lawry v. McKennie,* 177 Or. 604, 164 P. (2d) 444. No decision is cited by the majority for the view that the test for determining liability or nonliability in this class of cases is whether the tort is "wilful"—which is a different thing from "malicious". I have found no such decision, and I respectfully suggest that that view has no support in reason. Apparently, the justification for making "wilful tort" the touchstone is that the commission of such an act by a parent, resulting in injury to his child, demonstrates that the security, tranquility and peace of the home have already been disrupted; and the public policy behind the rule of parental immunity, therefore, has nothing to operate upon. But, if that be true in this case, it would be equally true in every case brought by a child-guest against a parent under the statute above referred to. There is no basis for such an assumption; nor is there for the conclusion here that the peace of the home had been disrupted because a logger, in his misguided attempt to celebrate V-J Day, got drunk, commanded his son to ride with him in his automobile, and drove so recklessly—if he did so—that the journey ended in death for both of them.

In short, I am unable to find in the facts of this

case a logical basis for taking it out of the conceded rule of parental immunity, and am therefore compelled to record my dissent.

Entertaining this view, I express no opinion upon the very close and difficult question of whether or not the evidence is too uncertain and speculative to have warranted submitting the issues of negligence and proximate cause to the jury.

I am authorized to say that Mr. Justice BAILEY concurs in the foregoing dissent.

I concur in the dissenting opinion of Mr. Justice BRAND.

BRAND, J., dissenting.

Seldom, if ever, does a good surgeon saw a man's leg half off. Yet that, I fear, is the kind of operation which my brethren of the majority are performing upon the rule of law which bars recovery by an unemancipated infant against his parent in an action for tort. They have commenced the amputation; they are unwilling to complete it, and there is no safe place to stop. We are told that law is a progressive science and that we should not be bound by the rule unless it is supported by reason and justice. We are led to anticipate the amputation of the rule from the body of the law. But not so. We are told that "it is unthinkable that a parent while acting within the scope of domestic relations should be brought into court to defend against every unintentional personal tort that might be committed against a minor child".

Persuasive criticism is heaped upon the decisions which grant immunity to a parent who rapes or brutally beats or maliciously harms or imprisons his child in

an insane asylum. The peace and harmony of the family, the maintenance of which is the basis for the rule of non-liability, has already been destroyed, it is said, when a parent inflicts intentional harm upon his child. There is great weight to that argument. But the complaint in the case at bar alleges that the father while intoxicated "was guilty of gross negligence and failed to exercise any care for the safety" of his son and that "each and all of the acts of negligence herein alleged * * * caused the death" of the son. The majority holds that "there is some substantial evidence to support the allegations of gross negligence and intoxication." But it is conceded that the father did not intentionally harm his son, and there is no evidence of any malicious or intentional infliction of harm. The majority invokes the presumption that a person intends the ordinary consequences of his voluntary act. But the presumption cannot and should not control where, as here, there is no pleading or proof that the consequences were intended and it is conceded that they were not.

The posture of the case is an awkward one. It is arguable that the entire rule of non-liability should be exercised but the court is unwilling to do so. It is arguable that a public policy grounded on the rule which guarantees to every man a remedy for wrong done him, outweighs the rule of policy which grants parental immunity at least where intentional harm is inflicted. But that question is not before us.

The majority adopts a nebulous middle position which will I fear, leave the last state of the rule worse than the first. If the rule of this case prevails, other and different charges of gross negligence will be brought and we will have the spectacle of an infant by

a guardian ad litem suing his parent while court and jury flounder about in a maze of uncertainty as to the difference between simple and gross negligence and attempt to determine when a wrong, neither malicious nor intentional nor merely negligent, constitutes an actionable wilful tort. The Chief Justice has adequately dealt with this aspect of the case and I concur in his comments. It is suggested that the mantle of non-liability is available ''only when the father injures his child while discharging a parental duty''. Thus is added a new element of confusion. Applying that test it might be inferred that the father would be liable for injury caused by simple negligence if, at the time, he was not discharging a parental duty. It would be equally confusing to hold that violation of the criminal law is the test of liability. Many acts of mere negligence or mere intoxication resulting in harm to another are punishable as crimes.

It is argued that if the rule of non-liability is applied in this case it will result in absurdity and that the tranquility of the home cannot be disrupted by the litigation when both father and son are dead. This is true, but courts cannot decide individual cases on the basis of an intuitive sense of justice with eyes closed to the consequences which may follow the adoption of a new rule. Father and son are dead and so far as they are concerned there will be no disruption of family relationship, but the right of the plaintiff to sue depends upon the wrongful death statute, O. C. L. A., § 8-903. The administrator can sue only if the son ''might have maintained an action, had he lived'', against the wrongdoer (the father) ''for an injury done by the same act. * * *'' Difficult as it may be, we must therefore consider this case as if it were brought by a living

son against a living father. Nor is the disruption of the spiritual harmony of the family the only basis for the policy which denies recovery in these cases. Recovery by an infant suing by guardian against his father might in many instances result in the transfer to the infant of the family assets on which other innocent children, members of the same family, are dependent for support. It must be remembered that the law as well as parental affection imposes upon a father the duty of care for an injured child whether the injury was the result of a tortious act or of pure accident. 39 Am. Jur., Parent and Child, § 47, p. 672. Oregon statutes provide not only for the punishment of a father who without just cause fails to care for his child; procedures are also authorized by means of which he may be compelled to provide the requisite care. O. C. L. A., §§ 23-1043 to 23-1047, inclusive.

It may be believed that in this case the mother is the heir of the deceased infant and that therefore the other children in the family will not be deprived of support if the plaintiff prevails. But would the majority say that the right of recovery should depend on the identity of the heir of a deceased infant? And what would be the decision if a living son recovered where death did not intervene? Again, if only the son had died in the accident, the surviving father would be one of the heirs of the son and as such entitled to share in the proceeds of the judgment against himself.

The plaintiff argues that "the fact" that the father carried insurance is relevant to the issue and that recovery would consequently enhance rather than deplete the assets of the surviving widow and children. It is arguable that recovery should be allowed when there is insurance, though the authorities are to the contrary,

but that issue is not presented by the pleadings nor shown by the evidence and we have no right to indulge in speculation as to the fact; much less have we the right to base a theory of recovery on speculation. The majority opinion properly declines the plaintiff's invitation to base the decision on assumptions unwarranted by the record.

Again, I know of no basis for a distinction which would maintain the immunity of a parent for torts committed in and around the home but would allow recovery for like "wilful" torts if committed in an automobile.

I agree with the following statement in the concurring opinion of Mr. Justice ROSSMAN: "The ultimate result to the child and to society resulting from non-liability is good."

Finding no basis on which the purported rule announced by the majority could be fairly and justly administered in future cases, I am constrained to doubt the soundness, if not the existence, of such rule and to dissent from the decision, notwithstanding a natural sympathy for the bereaved widow and mother.

Mr. Justice BAILEY joins in this dissent.