Argued October 3, 1963, reargued March 30, reversed with
instructions May 13, petition for rehearing denied
June 9, 1964

# ROEHR v. BEAN

392 P. 2d 248

*Edwin J. Peterson,* Portland, argued and reargued the cause for appellant. With him on the briefs were Earle P. Skow and Tooze, Powers, Kerr, Tooze & Morrell, Portland.

*Thomas Cavanaugh,* Portland, argued and reargued the cause for respondent. With him on the brief were Vergeer & Samuels, Portland.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Denecke and Lusk, Justices.

PERRY, J.

On April 22, 1959, the plaintiff's intestate Donald C. Wickersham was riding as a guest passenger in a Triumph sports car owned and driven by Gene Rutherford. An accident occurred approximately 5 miles east of Tillamook and both Wickersham and Rutherford were killed.

The plaintiff brought this action to recover damages for the alleged wrongful death of Donald C. Wickersham. The jury returned a verdict for the plaintiff and the defendant appeals.

The principal contention of the defendant is that the evidence, viewed in a light most favorable to plaintiff, fails, as a matter of law, to establish gross negligence on the part of Gene Rutherford, the driver of the sports car.

The evidence discloses that Wickersham and Rutherford, both of whom lived in Forest Grove, had driven to Tillamook. There they visited several people, and in the evening drove to the Juno Inn, a bar

and grill 2.5 miles north of Tillamook. They left the Juno Inn at approximately 2:15 a.m. At approximately 2:30 a.m., a Tillamook city policeman, who was driving north on Pacific avenue in Tillamook, noticed a white Triumph sports car crossing Pacific avenue at Third street. Third street is about two blocks north of where the policeman was at that time. At Third street where it intersects Pacific avenue there is a designated "Stop" sign for those crossing Pacific avenue.

The officer's testimony is as follows:

"A   I was approximately two blocks south on Pacific Avenue, from Third.

"Q   What time of night was this that you first observed this car?
"A   Approximately 2:30, day time.

"Q   And is there any traffic control at the intersection of Third and Pacific?
"A   Yes, there is. There's a yellow caution light for Pacific Avenue and a red stop light for Third Street.

"Q   All right, what did you do—what did you observe this white Triumph sports car do in relation to that stop light?
"A   I observed it—*a white Triumph go through the intersection of Third and Pacific at a fast rate of speed, faster than I thought it should have been, for that particular stop sign.*
"* * * * *

"Q   Did you form any opinion as to the speed of that car as it went through that intersection?
"A   *I cannot put a speed on it.* I will say faster than it should be to negotiate the stop light.

"MR. SKOW: I move that answer be stricken, if the Court please. It doesn't tell us anything. It's not responsive.

"THE COURT: He asked the question whether you had an opinion as to the speed.

"THE WITNESS: I would judge maybe *fifteen miles* an hour."
(Italics ours)

The officer then started in pursuit. However, there is no evidence that he flashed his light or sounded his siren so that an inference could be drawn that the driver of the white Triumph knew of the pursuit and was attempting to run away from the officer. As to the pursuit, the officer testified as follows:

"Q   Did you ever catch up with the car?
"A   No, I did not.

"Q   Did you ever gain on it?
"A   *Slightly, on the flat highway.*

"*    *    *    *    *

"Q   Okay, and at the time you last saw the car, the Triumph, was it still proceeding east on Highway 6?
"A   Yes, it was.

"Q   *What was your speed just before you broke off the chase?*
"A   *It was around eighty-five.*

"Q   And was it two and a half miles from this turn that you had attained this 85 miles an hour speed?
"A   I don't understand your question.

"Q   Was *it just before* you broke off your chase that you reached this 85 miles an hour?
"A   Yes."
(Italics ours)

The officer further testified that the night was clear, there was no fog or mist, and the pavement was dry. He also testified that this was a new highway with a divider thereon where this accident occurred.

Other evidence discloses that there was no other traffic on the highway at this hour of the morning.

A state police officer, who arrived at the scene of the accident at approximately 6:20 a.m. that morning, was called as a witness by plaintiff and testified as follows:

"A  Well, the highway here is—the first four and eight tenths miles from Tillamook is a new highway. It joins the old highway on a curve and the highway there is—has a divider in the center of the road. There is another side road that enters Highway 6 there also, traveling east or towards Portland. The highway where the new highway joins the old highway is a gradual right turn. The road itself is asphalt, both sections, the new and the old.

"Q  Now, are there any dividing marks on the highway at this point?

"A  Well, the highway is divided by a broken white center line, the roadway itself, for each lane of traffic.

"Q  Are there any—oh, I don't know what you call them, traffic separators or raised parts of the highway at this point?

"A  Yes, there is one island there that is— divides the highway so that the eastbound traffic, or the westbound traffic heading towards Tillamook must stay to the right of this island; and if you want to turn left you can bear to your left and go up the—this—what would be—just a side road, goes right off at this island and the eastbound traffic coming towards Portland has to keep to the right and go around the divider so the side road can enter from the south and the people that want to turn to the right there can get over in the other traffic going by. These are painted yellow. They are a raised asphalt. It is laid out, of course it's

an odd-shaped divider, but it is laid out. Those asphalt strips are laid out. They are raised approximately 2 to 3 inches up off the highway and are painted yellow with a yellow line completely around it.

"Q All right, now did you, during the course of your investigation, find any marks or gouges on the raised dividers?

"* * * * *

"A Something had struck the edge of the jingle bars, as they are called. They are painted yellow. Part of the asphalt and some of the yellow paint had flaked off and was out on the main traveled portion of the road.

"Q *All right, did you observe any skid marks on the highway?*

"A Yes, sir, there were.

"* * * * *

"A The skid marks were not—was not one solid mark. *The first mark was at the island on the new highway and there was marks from that point to where the car left the black top, but there was no—there was not one solid mark, there was just the black marks.*"

(Italics ours)

The officer also testified that on other occasions he had seen evidence of cars driving over raised bars used as dividers in the highway.

As argued by both parties, it was the striking of these bars that triggered the accident.

In *Williamson v. McKenna,* 223 Or 366, 354 P2d 56, an opinion by Mr. Justice O'CONNELL, this court, after an exhaustive review of the prior decisions of this court, adopted the broad definition of "reckless conduct" set out in Restatement, 2 Torts, Negligence 1293,

§ 500, as a guide to distinguishing between gross negligence and ordinary negligence, as follows:

> "The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, *knowing or having reason to know of facts* which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a *high degree of probability that substantial harm will result to him."*

(Italics ours)

As stated by the late Mr. Justice BRAND, in *Turner, Adm'r v. McCready et al.,* 190 Or 28, 46, 222 P2d 1010:

> "The task of drawing a line of demarcation separating cases in which there is evidence only of ordinary negligence from those in which there is substantial evidence of gross negligence or reckless disregard is one of the most difficult and delicate tasks imposed upon the courts. * * *."

Nevertheless, if we are to perform our duty, we must in a given case carry out our functions. *Williamson v. McKenna,* supra.

It is clear from the above definitions, and their interpretation as set out in *Williamson v. McKenna,* supra, that the doing of a negligent act alone is not sufficient to constitute gross negligence. There must be other factors involved.

■ These other factors are generally to be found in the other circumstances surrounding the occurrence which are so obvious that a reasonable man would recognize the danger and realize that a high degree of probability exists that to encounter that danger will result in serious harm.

■ In this case, the record does not disclose the indicated speed. To drive in excess of the indicated

speed is only prima facie evidence of negligence. There must be other circumstances then and there existing to warrant the conclusion that the operation of the vehicle in excess of that speed constituted a negligent act.

We said in *Burrows v. Nash,* 199 Or 114, 121, 259 P2d 106:

"* * * Combined with other conditions, a violation of the basic rule may be considered upon the question of gross negligence; but it certainly would be an unusual case, indeed, where speed, in and of itself, would constitute gross negligence within the meaning of the law."

As previously stated, the evidence discloses the other circumstances to be only a night that was clear, pavement that was dry, a highway that was straight and level, and no other traffic.

There is no evidence in this case of any fact signaling great danger to a driver of a motor vehicle at this point where the operator apparently lost control of the vehicle.

It is certain the highway commission would not employ these slightly raised bars to form an island on a completed highway if it was common knowledge that these bars constituted an obvious danger of great bodily harm to the traveling public.

■ When the evidence in this case is analyzed as it is necessary for us to do, it shows no more than that Gene Rutherford drove his automobile at a speed of approximately 85 miles per hour, that he struck the two to three inch bars placed in the highway and lost control of the vehicle.

This discloses negligence, but falls short of estab-

lishing gross negligence as defined in *Williamson v. McKenna,* supra.

The trial court erred in failing to sustain the defendant's motion for a directed verdict.

The judgment is reversed with instructions to enter judgment for the defendant.

SLOAN, J., dissenting.

The real problem presented by this case is to determine if the inferences to be drawn from the factual evidence were so "tenuous" that a jury should not be permitted to make them. *Eitel v. Times, Inc.,* 1960, 221 Or 585, 352 P2d 485. And do the permissive inferences indicate the state of mind defined in *Williamson v. McKenna,* 1960, 223 Or 366, 354 P2d 56.

I think the factual evidence does create permissible inferences that Rutherford's conduct involved a high degree of probability that harm could result and that he could well have known that he was courting disaster. *Williamson v. McKenna,* supra.

I will not attempt to mention all of the possible inferences. It does appear that the speed at which the car was being driven in Tillamook in violation of a traffic light; the lack of other traffic of any kind and the extreme speed at which the Tillamook police officer followed Rutherford could have caused the latter to believe he was being pursued by a police officer, even though there was not, of course, any direct evidence to that effect.

It could also be inferred that under all of the circumstances Rutherford must have been aware that he was driving so fast that he could not control the car if he encountered an impediment in the highway such as the "jingle" bars at the curve. The jury could have inferred that the rate of speed was so great that

effective control of the car was not possible. In a case quite similar, as to this aspect of the situation here, Justice BELT, for the court, stated: "The skid marks and course of the car plainly speak of excessive speed and loss of control of the car." *Cowgill, Adm'r v. Boock, Adm'r,* 1950, 189 Or 282, 290, 218 P2d 445, 449. This case was properly submitted to the jury.

. Chief Justice McALLISTER and Justice O'CONNELL join in this dissent.