Argued at Pendleton October 28; affirmed December 3, 1940

# BABCOCK *v.* GRAY

(107 P. (2d) 846)

*Nicholas Jaureguy,* of Portland (Cake, Jaureguy & Tooze and Courtney R. Johns, all of Portland, on the brief), for appellant.

*Sam Van Vactor,* of The Dalles (Paul W. Childers and Brown & Van Vactor, all of The Dalles, on the brief), for respondent.

BAILEY, J. This action was brought by O. L. Babcock, administrator of the estate of Bill Jim, deceased, against Lloyd Gray, administrator with the will annexed of the estate of Carl Gray, deceased, to recover damages for the death of Bill Jim, who died as the result of injuries suffered by him in an automobile collision allegedly caused by the negligence of Carl Gray. From a judgment in favor of the plaintiff the defendant appeals.

The accident out of which this litigation arose occurred about 7 o'clock in the evening of July 13, 1938, on the Columbia River highway a few miles east of The Dalles, Oregon. The pavement on the roadway at the place of the accident is 20 feet wide and marked in the middle by a yellow line paralleling the course of the roadway.

Three motor vehicles were involved in the collision: a truck operated by J. H. LaFore, a Chevrolet coach operated by Bill Jim's son Johnnie and occupied also by Bill Jim, his sister and another son, and a Chevrolet coupe operated by Carl Gray, who was accompanied by his wife. At the time of the accident the Jim car was proceeding easterly and was on the south half of the paved part of the highway, at the driver's right of the yellow line. The truck was traveling westerly on the north half of the paved part of the highway. As the truck approached within a short distance of the Jim car, Carl Gray, who was following that car, passed the Jim car on the left side and immediately thereafter his coupe collided head-on with the truck. By force of the impact both the truck and the Gray car were thrown across the highway to the south side, where they struck the Jim car, and all three vehicles went over the embankment at the south side of the highway. Bill Jim, his sister, and Carl Gray and his wife died from injuries suffered in the accident.

There were three eyewitnesses of the collision: J. H. LaFore, Johnnie Jim, and G. H. Blakley, a disinterested witness who happened to be driving along the highway a short distance behind the Gray car. Johnnie Jim testified that the car in which he was

riding was traveling at the rate of approximately 30 miles an hour. The truck, according to the testimony of its driver, was going about 25 miles an hour. Mr. Blakley, a resident of Chicago, by deposition testified that the truck was traveling at the rate of 50 to 60 miles per hour, the Jim car at 45 to 50 miles an hour and the Gray car at 70 to 80 miles per hour.

Mr. Gray was taken to a hospital at The Dalles after the accident, unconscious. He was there examined by a doctor, who found that he had been drinking intoxicating liquor. Asked, as a witness, to what extent Gray had been drinking, the doctor testified: "He must have had considerable, because the odor was very plain."

The first assignment of error is based on the defendant's exception to part of the instruction given by the court. In considering this assignment it will be necessary to review briefly the pleadings in the case.

In paragraph IV of the complaint is set forth in detail the manner in which the accident occurred. Thereafter the following allegations appear, in paragraph VI:

"That said accident, collision and injury to plaintiff's intestate was caused wholly by the negligence of the said Carl Gray, and his said negligence among other things consisted in particular of the following acts, to wit:

"(a) In that the said Carl Gray:

"1. Carelessly, recklessly, negligently and unlawfully attempted to pass the Chevrolet coach in which plaintiff's intestate was riding, when the left or north side of the paved portion of the Columbia River highway, at said time and place, was not free of oncoming traffic a sufficient distance ahead so as to permit such overtaking and passing to be completely made

without impeding the safe operation of the vehicle in which plaintiff's intestate was riding;

"2. In recklessly, carelessly and negligently driving said Chevrolet coupe at an unlawful and excessive rate of speed, and at a speed in excess of 70 miles per hour.

"3. In recklessly, carelessly, negligently, and unlawfully driving a motor vehicle upon a highway in a manner carelessly and heedlessly and in wilful and wanton disregard of the rights and safety of others and without due caution and circumspection, and at a speed and in a manner so as to endanger the person and property of others."

A motion was filed by the defendant to strike subparagraph 3 of paragraph VI from the complaint, "on the ground and for the reason that the allegations set forth conclusions of law and not allegations of fact and are irrelevant, immaterial and redundant". As an alternative motion, in the event that the motion to strike should be denied, the defendant asked the court for an order requiring the plaintiff to make subparagraph 3 more definite and certain by setting forth "in the said complaint the facts by which plaintiff claims that said deceased was careless, reckless, and negligent and in which he was unlawfully driving said motor vehicle in wilful and wanton disregard of the rights and safety of others", on the ground that the allegations of subparagraph 3 "do not advise this defendant of the facts constituting plaintiff's alleged cause of action with sufficient clearness to enable the defendant to prepare his defense." This motion was never passed upon by the court.

■■ The court instructed the jury that the complaint set forth three distinct causes of alleged negligence on which the plaintiff relied. Then the court stated to

the jury in substance the contents of subparagraphs 1, 2 and 3 above quoted, and thus continued:

"It is not necessary for the plaintiff, in order to have a recovery at your hands, to establish all of the three allegations of negligence. If by a preponderance of the evidence the plaintiff has satisfied your minds that the said Carl Gray was negligent in any one of the three, as I have read them, and that such negligence was the proximate cause of the death of the said Bill Jim, why, that would be sufficient to entitle plaintiff to recover. In other words, he does not have to prove the entire three."

Exception to this instruction was worded as follows:

"The defendant wishes to save an exception to the court's submitting to the jury the three alleged specifications of negligence in the complaint, or, more particularly, we desire to save an exception to submitting to the jury the third alleged specification on the ground that the third alleged specification does not set forth any facts, but merely sets forth conclusions of law; on the further ground that we have heretofore moved to strike that third specification on the ground that it only sets forth conclusions of law, and the motion has been denied, and, for the same reasons we advanced then, we now save an exception to submitting that third one."

The appellant in oral argument stressed the proposition that inasmuch as subparagraphs 1 and 2 of paragraph VI contained specific allegations of fact relied upon to constitute negligence on the part of Carl Gray, the specific allegations controlled what the appellant terms the "general averments" of subparagraph 3 of paragraph VI of the complaint, and that therefore the trial court erred in failing, in its instruction, to limit the jury's consideration of negligence to the specific averments of subparagraphs 1

and 2. This same contention is also made in the appellant's brief.

Since the exception to the court's instruction was not taken on the ground above urged, that certain allegations of the complaint were general and were controlled by other allegations that were specific, it is obvious that the court did not err in not limiting the consideration of the jury to the acts of negligence charged to Carl Gray in subparagraphs 1 and 2 of paragraph VI of the complaint. Moreover, in view of the fact that the complaint first sets forth the manner in which the accident occurred, in detail, it is our opinion that the subsequent charges of negligence contained in the three subparagraphs of paragraph VI may be treated as a summary of the various acts of negligence theretofore averred. And furthermore, subparagraph 3, above quoted, in effect charges that Carl Gray's conduct in the operation of his motor vehicle constituted reckless driving as defined by § 55-2105 (a), Oregon Code 1935 Supplement.

In *Snabel v. Barber*, 137 Or. 88, 300 P. 331, the appellants assigned as error the giving of the following instruction:

"It was the duty of the defendants to drive their automobile in a careful and prudent manner and at a speed not greater than is reasonable and proper and no person is permitted to drive an automobile at such a speed as to endanger the life, limb or property of any person, and if defendants failed to comply with this rule of law they would be negligent and if this was the proximate cause of plaintiff's injuries and plaintiff was not negligent then your verdict should be for the plaintiff."

This court, in passing upon the instruction, said:

"Defendants contend that this instruction was in respect to a matter not in issue and was not applicable

to facts proven. That defendants did not have their car under control at the time of the accident was one of the grounds of negligence alleged in the complaint and that it was applicable to the facts proven is manifest from a mere reading of the evidence offered upon the trial, but defendants' principal objection to this instruction we think is wholly untenable. They contend that because there was a specific allegation in the complaint that defendants, at the time, were operating their automobile at an excessive, and what was then an unlawful, rate of speed, to wit, more than thirty-five miles per hour, they had a right to rely upon this specific allegation as the particular ground upon which plaintiff must recover, if at all, and that an instruction such as the one given, which would have been applicable even though defendants were driving at a much less rate of speed than thirty-five miles per hour without having their car under control, was prejudicial.''

After pointing out that the appellants' contention was based on a decision of the Kansas City (Missouri) court of appeals and that such decision was subsequently overruled by the supreme court of Missouri, the opinion in the Snabel case held that the instruction objected to was within the issues and correctly stated the law applicable to the facts before the court.

The trial court in *Brady v. Schnitzer,* 135 Or. 250, 295 P. 961, which was an action to recover damages for personal injury sustained in an automobile accident, charged the jury substantially in the language of the statute above cited and that of subparagraph 3, *supra.* On appeal to this court the defendants predicated error on the giving of that instruction. It was held that in so charging the jury the court did not err and, furthermore, that ''the instruction is in the language of the motor vehicle act.''

■ We cannot agree with the appellant that the specification of negligence embodied in subparagraph 3 of

paragraph VI "merely sets forth conclusions of law". It avers facts virtually in the language of the statute defining reckless driving: *Hoffman v. People's Motorbus Co.* (Mo. App.), 288 S. W. 948; *O'Brien v. Wilmington Provision Co.*, 34 Del. 214, 148 A. 294. See also *Brady v. Schnitzer*, supra, and *Snabel v. Barber*, supra.

The defendant was not in any way misled by the averments of subparagraph 3 of paragraph VI. After moving to have the allegations of that subparagraph made more definite and certain, the defendant filed his answer to the complaint without waiting for a ruling of the court on his motion. No error was committed by the court in giving the instruction of which complaint is made.

■ The next two assignments of error are treated together in the argument in appellant's brief and are based on the following facts: Frank Grimm, a sergeant of the Oregon state police, was called as one of plaintiff's witnesses. He had been detailed to investigate the accident here involved and approximately 40 minutes after it occurred he arrived at the scene of the collision. He there made entries in his report book and a sketch of what he observed. As a witness he was requested to make a map, refreshing his memory from his official notes, to show the roadbed, the shoulders and other details of the highway at the place of the accident. With a pencil he drew on a legal-size piece of paper a sketch indicating the roadbed, the pavement (the width of which he marked as 20 feet), the shoulders at the side of the pavement (the width also noted), and the approximate location of the three vehicles involved. He also showed on the paved part of the highway two burnt tire marks, designating the length of one as 43.1 feet and the other as 29.7 feet.

On cross-examination the attention of the witness was called to the fact that the skid marks as shown on his map were not drawn to the same scale as the width of the pavement, and he was asked by counsel for the defendant to indicate those marks on the map on a consistent scale. He responded that he was not drawing the map by scale and was unable to indicate the marks on the same scale as the width of the pavement, explaining that he was not testifying to the length of the marks in relation to any scale and was unable to comply with counsel's request. Then ensued the following colloquy between court and counsel:

"Mr. Jaureguy: I wonder if I could get an instruction from the court to the witness to mark it on the map, what I have asked him to mark on the map?

"The Court: He doesn't claim, as I understand it, to be an expert engineer, or surveyor, and he is not able, if I catch his objection right, to figure scales. I think Mr. Wilhelm could do it.

"Mr. Jaureguy: I could do it if I wanted to take the time, and your Honor or anybody could.

"The Court: Yes.

"Mr. Jaureguy: And I could do it right now. But I am not a witness, I can't put these marks on the map. All I have got to do is to have somebody do it, somebody else. Anybody can do it. Now, I measured here and we know.

"The Court: The witness says he can't."

The request of counsel was denied and an exception was saved. Later, this map was offered in evidence and an objection to its introduction was made by defendant's counsel, "on the ground that there is such a great disproportion between the scale used for the two tire marks on the north half of the road and the remainder of the sketch as to be confusing and misleading to the jury and not giving them an accurate

picture of what the witness found out there when he inspected the highway.'' The refusal of the court to instruct the witness as above requested by defendant's counsel and the admission of the map in evidence over defendant's objection are complained of in the two assignments of error last above mentioned.

We fail to see any error in the court's refusal to instruct the witness to do something that he said, apparently stating a fact, he was unable to do.

The map was drawn for the purpose of illustrating the testimony of the witness, and that was its only use in the case. The witness did not claim that it was an accurate representation, drawn to scale, of the physical facts to which he was testifying. The jury understood from the discussion concerning it, as well as from the explanation made by the witness, that the map was not drawn to scale and that the witness was testifying more from the actual measurements made by himself than from the relative distances shown on the map. This court, in *Knapp v. Standard Oil Co.*, 156 Or. 564, 68 P. (2d) 1052, in passing upon an objection to the admission of photographs in evidence, stated that the action of the trial court in admitting or refusing to admit photographs in evidence is largely a matter of discretion, not to be disturbed unless abuse of discretion is shown. The same rule would apply to the admission of maps and charts: 22 C. J. 913, § 1115. There was no error in the admission of this map in evidence as part of the testimony of the witness: *Deitchler v. Ball*, 99 Wash. 483, 170 P. 123; *Territory v. Price*, 14 N. M. 262, 91 P. 733; 22 C. J. 910, § 1114.

George E. Fitzgerald, a witness called on behalf of the plaintiff, testified that he had a conversation at The Dalles with Carl Gray about 3 o'clock in the

afternoon preceding the accident and that Mr. Gray talked to him about driving "back from The Dalles to Arlington". His further testimony in this connection was as follows:

"Q. What did he say about it, driving from here to Arlington? A. Well, we bid each other goodby and shook hands, and he just happened to look up at the clock and said he was going home and that he would be at Arlington at a certain time. Of course, then I looked.

"Q. What time did he say? A. I don't particularly remember what time he said. He just looked at the clock and said he would be at home at a certain time.

"Q. Did he tell you how fast he would try to make it? * * * A. No. I was the one that set the time, because I looked at the clock and questioned the time. I think I said forty-six minutes when he said it to me and just casually looked up at the clock and said— well, nothing serious about it, or anything.

"Q. In the time that he said he would make it in, he would have made it in forty-six minutes? A. That is what I said, yes."

Apparently, from the testimony, the witness understood Gray to state that he was leaving for Arlington immediately after the conversation which they had about 3 o'clock in the afternoon. The accident, however, did not occur until 7 o'clock or later in the evening, and only a few miles east of The Dalles. Mr. Gray must have changed his plans and given up the idea of reaching Arlington around 4 o'clock in the afternoon. If he changed his plans and did not leave The Dalles until four hours later than he intended doing at the time he talked to this witness, what Mr. Gray may have told the witness as to the time when he expected to arrive at Arlington could not have any bearing on the rate of speed at which he was traveling when the accident occurred. The admission of this testimony was

erroneous, yet it could not have prejudicially affected the defendant's rights, in view of the undisputed evidence that Gray was driving his car at the rate of 70 to 80 miles an hour at the time of the collision.

The next two assignments of error are considered together in the appellant's brief and relate to the testimony of two witnesses concerning the ability and capacity of Bill Jim as a laborer.

Mrs. Alice Saling testified that she lived between Bickleton and Roosevelt in the state of Washington, that she was a school teacher and had taught for 20 years off and on, in that locality, that she had known Bill Jim and his family for 24 or 25 years, and that Bill Jim and his family very frequently stopped at her home. She was asked: "Do you know how Bill Jim made his living?" Her answer was: "Well, I suppose as most Indians do, by fishing, hunting, picking huckleberries, picking potatoes and hops, oh, just anything he could get to do." The next question asked her was this: "Would you say from all you know about Bill Jim and your long acquaintance with him about his ability in the capacity of a laborer?" To this an objection was interposed, on the ground that the witness had not shown sufficient knowledge of the facts "to testify as to her opinion". The court overruled the objection and Mrs. Saling continued to testify, as follows: "Well, our family all regard him very highly as a laborer. He had exceptional ability to provide for his family and you never found them begging around, or stealing, or anything of that kind. He was plenty capable of supporting his people." The defendant thereupon moved to strike the answer, and the court struck out that part of it referring to the regard in which the family of the witness held Bill Jim's ability, and the statement about not stealing.

Mrs. Saling later was asked to give her own opinion of Bill Jim, as to his ability and capacity to labor. She thus answered: "Well, in my long acquaintance with him I have found and know that he works whenever there is work to do. Does that answer that?" In response to a direct question, whether she would say that he was an industrious man, Mrs. Saling gave an affirmative answer.

On cross-examination this witness testified that she had seen and talked with Bill Jim many times. Her further questioning by counsel for the defendant thus continued:

"Q. So that your opinion of him is not derived from having seen him work? A. No, I haven't seen him work, but they would go through my parents' place always in going from their camp to the different fields to work, and when they would do potato picking over in the valley he would come home, haul potatoes, vegetables, and things of that kind, and fish, the same thing."

The other of these two witnesses, Carl Seely, testified that he was a road foreman, that he had lived for 25 years about five miles from Pine creek, where Bill Jim lived, that he had known Bill Jim 22 years, that Bill Jim lived on a little farm of about 10 acres, that the witness had passed the place numerous times and had seen Bill Jim at work there, and that he seemed always to be busy. Mr. Seely was then asked if he had an opinion as to Bill Jim's "ability and capacity to labor" and answered that Bill Jim seemed to be an ambitious Indian. Asked if he was industrious, the witness answered: "Well, I have saw him plow and sow, mow hay, haul her in, saw him haul her in when I was driving by there." He further testified that Bill

Jim had some horses on his ranch and that he had heard of his selling hay and horses and doing fishing.

On cross-examination Mr. Seely stated that he lived about two and one-quarter miles from the Jim ranch and that it had been 20 years since he had seen any wheat or alfalfa growing on that ranch. He also testified that he had not seen Bill Jim working on his ranch during the past 20 years and that he had gone by the place only about three times during the past five years.

At the conclusion of the cross-examination, the defendant moved that the answer of the witness "in which he expressed an opinion as to the ambition and industry of Bill Jim be stricken on the ground that his knowledge is too remote." This motion was denied.

Before discussing further the above assignments of error, we shall take up the testimony of other witnesses concerning the kind of work that Bill Jim had been accustomed to do. Bill Jim was an Indian, 46 years of age at the time of his death. He had a wife and four sons. He had also had a daughter, who predeceased him. He owned, by allotment from the federal government, a ranch on Pine creek in the state of Washington. His son Johnnie, 21 years of age, testified that Bill Jim, every spring and fall, did commercial fishing, that he raised about 10 acres of alfalfa on his ranch and there produced fruit and vegetables also, and that he did some trapping. At the time of his death Bill Jim owned 28 horses.

W. K. Reader, who lived at Roosevelt, Washington, where he had conducted a store since 1910, testified that he had known Bill Jim since 1909 and that Bill Jim had been a good customer of his store since 1910, buying all kinds of groceries, clothing and farm implements,

for which he invariably paid cash. He further testified that Bill Jim farmed, raised some alfalfa and, "like a great many" Indians, "he would go to the hop fields, potato fields and down here to your fair city to pick cherries, along to Hood River for strawberries" and that he also did fishing. "He trapped all winter. I don't think that during the trapping season there was hardly a week, or every two weeks, that he came into town, that he did not ship off a bundle or so of furs to some eastern fur houses in Missouri or Montana, or, once in a while, to Seattle."

John Whiz testified about Bill Jim's fishing and the places where he fished. He stated also that in the fall fishing season the average Indian fisherman made about $300.

Robert Glasco, an Indian who had lived about half a mile from Bill Jim's home for the past five years and had rented some of his land, testified as to Bill Jim's farming, fishing and other activities.

Reverting now to the testimony of Mrs. Saling and Carl Seely, it should be observed that those witnesses had known Bill Jim very well for some 20 years or more and had seen him frequently during that time. They may not have seen him actually working, but they had seen him going to and from places where Indians were accustomed to work during different seasons of the year. The weight to be given the opinions expressed by these witnesses as to the industry of Bill Jim was for the determination of the jury. Considered in connection with the uncontroverted testimony of other witnesses as to Bill Jim's industry and observed disposition to work, such testimony of Mrs. Saling and Mr. Seely was properly admitted.

■ Mrs. Elizabeth Glasco, a witness for plaintiff, was asked this question. "Did you notice how they [Bill

Jim's wife and children] have lived since the death of Bill Jim?" Her answer was an affirmative. Objection was then made, on the ground, as stated by counsel for the defendant, that "under the measure of damages, as permitted by the statute, the matter of how the family lived after his death would have no bearing at all." The proceedings thus continued:

"The Court: It is not with reference to that. I think I will admit it. It has already been admitted once. Go ahead. Exception allowed.

"Q. Go ahead, explain it to the jury. A. Well, one thing I can say, before Bill Jim's death he did not— we never have to help them out in any way with food, and last winter, all winter, we gave potatoes and flour, well, every ordinary thing a person eats, you know, and he never had come before or any of the children asked us for food."

This testimony was introduced after the defendant had questioned various witnesses concerning Bill Jim's dependents, the number of children he had, whether they worked, how much money they earned, and how much other members of the family contributed to the support of the household. The subject had been opened up by the defendant in an effort to belittle Bill Jim's earning capacity and ability to provide for his family. No error was committed by the trial court in ruling as last above quoted.

 It was stipulated by counsel for the respective parties that "if a life insurance agent were put upon the stand he would testify that, according to the mortality tables used by standard insurance companies, the average length of life of a person aged 46 years old is 23.8 years." It was further stipulated that the witness "would not testify that, in arriving at these mortality tables, they take into consideration in their

statistics with respect to the length of lives of Indians; and that the above stipulation as to what the witness would testify to does not include any evidence with respect to these compiling tables taking into consideration the lives of Indians.''

The defendant asserts that the life expectancy shown by the mortality tables is not admissible in evidence, unless it be shown also that the tables were prepared so as to show the life expectancy of Indians.

The stipulated life expectancy of a man of 46 years, namely, 23.8 years, corresponds with the figures of the mortality tables set forth in 41 C. J. 215, of which courts take judicial knowledge. These tables are compiled by keeping for a great number of consecutive years an account of the average ages at which insured men and women die and taking the averages of all such ages: *Merchants' & Miners' Transportation Co. v. Borland*, 53 N. J. Eq. 282, 31 A. 272; *Gordon, Rankin & Co. v. Tweedy*, 74 Ala. 232, 49 Am. Rep. 813. There is nothing to indicate that in gathering such statistics the lives of Indians are not considered, as well as those of other races.

 The last assignment of error concerns the denial by the court of a motion for a directed verdict in favor of the defendant. In this connection it is urged that the evidence fails to show that the estate of Bill Jim had suffered any loss. This argument is based on the defendant's assumption that if Bill Jim had lived out his life expectancy, he would not have accumulated any property. The question of whether or not the estate had suffered damage was for the jury to decide, on the facts in the case. We cannot say as a matter of law that the estate of Bill Jim did not suffer loss because of his sudden death. The jury believed that a loss was

thereby caused, and awarded the plaintiff damages in the sum of $3,570.

This is an instance of the death of the plaintiff's intestate as the result of the wanton recklessness of the defendant's decedent, and, regardless of the error committed by the circuit court, the judgment appealed from should, in our opinion, be affirmed: Article VII, § 3, constitution of Oregon. It is so ordered.

RAND, C. J., and KELLY and BELT, JJ., concur.

ROSSMAN, J., concurs in the result.