Argued September 6, reversed and remanded October 17, 1950

# TURNER, Administrator, v. McCREADY et al. and ELLINGSWORTH, Administrator

## 222 P. (2d) 1010

ARLIE G. WALKER, Judge.

*Randall B. Kester,* of Portland, argued the cause for appellant. With him on the brief were James J. Kennedy and Maguire, Shields, Morrison & Bailey, all of Portland.

*Earl A. Nott* and *Francis E. Marsh,* of McMinnville, argued the cause and filed a brief for respondent.

Before LUSK, Chief Justice, and BRAND, BAILEY, HAY, LATOURETTE and WARNER, Justices.

BRAND, J.

This is an action for damages brought by Charles O. Turner as administrator of the estate of Charles Turner, deceased, against R. E. Ellingsworth as administrator of the estate of Ralph Ellingsworth, deceased. Charles Turner was a guest in an automobile driven by Ralph Ellingsworth, and the action, which is brought under O. C. L. A., § 115-1001, the guest statute, is based on alleged gross negligence of Ralph Ellingsworth, causing the death of Turner. There was a verdict and judgment for the plaintiff and the defendant appeals. We shall refer to Charles Turner, deceased, as Turner, and to Ralph Ellingsworth, deceased, as Ellingsworth. If reference is made to the administrators, who bear the same names as the deceased, the word "administrator" will be appended to the name.

The action was originally brought by Turner, administrator, against Ellingsworth, administrator, and also against the members of a partnership known as "W. J. McCready Lumber Company" hereinafter called the "Lumber Company", and against George B. Ortman, the agent of the Lumber Company. The verdict was in favor of the Lumber Company and Ortman, and they are not involved in this appeal.

The Lumber Company was the owner of a Ford flat bed truck, which, on May 15, 1946, at the hour of 1 P. M., was being operated by Ortman in a northerly direction on the Wapato Cut-off, a county road between Gaston and Newberg, and at that time Ellingsworth was operating a 1937 Pontiac coupe in a southerly direction along said road. Turner was riding as a guest of Ellingsworth. A collision ensued, resulting in the death of both Turner and Ellingsworth. In paragraph X of the complaint the plaintiff alleges the gross negligence of Ellingsworth and concurrent simple negligence by the other defendants. The allegations of this paragraph are denied by Ellingsworth. Paragraph XI of the complaint reads as follows:

"That at said time and place the said Ralph Ellingsworth operated and drove said Pontiac coupe automobile in a grossly careless and negligent manner and in reckless disregard of the rights of the plaintiff's decedent, Charles Turner, in the following particulars:

"1. In that he drove said automobile at a speed that was greater than would permit him to exercise proper control of said vehicle and to decrease the speed and stop the same as was necessary to avoid colliding with the 1939 Ford flat bed truck.

"2. In that he drove said Pontiac automobile upon said county road at a speed greater than was reasonable and prudent, having due regard for the surface and width of the highway and other conditions then existing.

"3. In that he failed to maintain and keep a proper lookout for other vehicles upon said highway and particularly for the Ford flat bed truck.

"4. In that he failed to keep and have said Pontiac automobile under proper control.

"5. In that he failed to drive said Pontiac coupe automobile as close as practicable to the right edge of said county road and upon the right half thereof."

Apparently, by inadvertence, but by inadvertence which might produce disastrous results, the defendant expressly admits the allegations contained in paragraph XI, supra. Defendant also admits that a collision occurred between the truck and the automobile. The complaint, in paragraph XII, alleged the ordinary negligence of the Lumber Company and Ortman, with specifications similar to those which appear in paragraph XI concerning the conduct of Ellingsworth. The defendant Ellingsworth, as administrator, denies the allegations in paragraph XII of the complaint. Paragraph XIII of the complaint alleges:

> "That the gross negligence of Ralph Ellingsworth, as hereinabove alleged, and the negligence of the defendants, George B. Ortman, W. J. McCready, M. C. McCready, J. R. McCready and W. W. McCready, as hereinabove alleged, were proximate and contributing causes of the collision occurring between the two vehicles  *  *  *".

This allegation is denied by the defendant. On the face of the pleadings, the charges of negligence and gross negligence by Ellingsworth are expressly admitted. *Babcock v. Gray,* 165 Or. 398, 107 P. 2d 846. It is elementary that an express admission is ordinarily conclusive as to the fact admitted. 41 Am. Jur., Pleading, § 201. It is also the recognized rule that when a defense contains both an admission and a denial respecting the same fact, the admission will prevail over the denial. *Veasey v. Humphreys,* 27 Or. 515, 41 P. 8; *Baines v. Coos Bay Navigation Co.,* 41 Or. 135, 68 P. 397; *Duncan Lumber Co. v. Willapa Lumber Co.,* 93 Or. 386 at 403, 182 P. 172, 183 P. 476; *Sayles v. Daniels Sales Agency,* 100 Or. 37, 196 P. 465; 49 C. J., Pleading, § 352, par. (3), p. 287. Notwithstanding the state of the pleadings, the entire case was tried by both parties

upon the theory that the alleged negligence and gross negligence of Ellingsworth was directly in issue. Evidence on those issues was received without objection, and the issues were submitted to the jury by the court without any objection based on the state of the pleadings. The case was argued before this court upon the theory that the alleged negligence and gross negligence of Ellingsworth was in issue.

■■ It has been held that an admission may be waived and that there may be such a waiver where the entire case is thereafter tried as if the admitted fact was in issue. *Caldwell v. Drummond,* 127 Iowa 134, 102 N. W. 842; *Conant v. Jones,* 3 Ida. 606, 32 P. 250; *Netcott v. Porter,* 19 Kan. 131; *Albion Milling Co. v. First National Bank of Weeping Water,* 64 Neb. 116, 89 N. W. 638; *Missouri Pacific Railway Co. v. Palmer,* 55 Neb. 559, 76 N. W. 169; *Williams v. Hayes et al.,* 20 N. Y. 58. This rule is especially applicable where, as here, the defendant has both denied and admitted the same fact in his answer, and where the admission was obviously the result of inadvertence. Under these circumstances, and in the interest of justice, we shall consider the case as if paragraph XI of the complaint had been denied.

By his first assignment, the defendant asserts that:

"The court erred in denying appellant's motions for involuntary nonsuit and directed verdict which were based upon the ground, among others, that there was no substantial evidence of gross negligence or reckless disregard of the rights of others so as to sustain a recovery under the Oregon guest statute".

We direct our attention to the issue thus presented. The evidence establishes that the collision occurred on a straight stretch of road, running in a northerly and

southerly direction and between six hundred and eight hundred feet in length. This straight section ends at its northerly extremity in a gradual curve to the east. The Pontiac coupe, driven in a southerly direction by Ellingsworth, and the flat bed truck, driven in a northerly direction by Ortman, collided on said straight portion of the road and about two hundred feet south of the curve at the northerly end of the straight section of road. The road had a hard gravel base with a light covering of loose gravel. The graveled portion of the road was nineteen feet in width according to actual measurement by the police officer. Prior to, and at the time of the collision, there were three visible single tracks made by car wheels, and on which there was little or no loose gravel. The photographs in evidence demonstrate that these so-called tracks were by no means ruts, but were merely such smooth tracks as appear on gravel roads having some loose material above the hard rock, or, as a witness stated, "just places where the rock has been kicked out by the passage of automobiles". Defendant Ortman testified that the easterly track was within eighteen inches or two feet of the small ditch on the east side of the road. The second or middle track was, of course, parallel to the first, and westerly of it. The distance between the two would be the ordinary distance between the right and left wheels of an automobile. The easterly and middle tracks were those commonly used by north bound traffic. There is evidence that the third or westerly single track was at such distance from the middle one as would result from cars driving in a southerly direction and using the middle and westerly track. However, though the defendant Ortman testified that there were three tracks, he also testified,

"But there isn't any on the west side of the road to speak of; wasn't at that time." There was no yellow line or visible mark to indicate the center of the road. Concerning the tracks, Ortman testified, "If you would be in the two west ones you would be straddle of the center * * * it's practically hardly half a car width from the center of the road."

Ellingsworth was driving the Pontiac coupe. With him in the front seat sat Mary King in the middle and Carl Herring on the right. Turner was sitting in the trunk or turtle back compartment on the left side immediately behind Ellingsworth. McMahon was lying in the middle of the trunk compartment and Hatfield was lying beside McMahon on the right. All of the occupants of the Pontiac coupe were students in the Gaston High School, and, at the time of the collision were on their way to a baseball game at Sherwood. As a result of the collision between the coupe and the truck, which Ortman was operating, Ellingsworth, Mary King and Turner were instantly killed. The other three passengers were rendered unconscious. Carl Herring was the only person in the coupe who is still living and who could have seen what happened. Herring was about sixteen years of age. Turner was sixteen and Ellingsworth about eighteen years of age.

The Ford truck, driven by Ortman, was equipped with a flat bed which was seven feet ten inches wide. The bed overhung the dual wheels about three inches or between three and four inches. The bed of the truck had a steel bottom with sides of four-inch channel iron. The bed was wider than the cab of the truck and extended beyond the edge of the cab about a foot. There was a running board at the door of the cab. The truck was fifteen and one-half feet long and weighed

"fifty or sixty-five hundred and a few pounds." At the time of the collision it was not loaded.

The coupe was following a car driven by Stanley Ohlsen, a schoolmate who was also going to the ball game. Herring testified that the Ohlsen car was visible while they were on the oiled road, but "we couldn't see it after we went on the gravel road". He testified that the Ohlsen car kicked up so much dust in the gravel road that they could not see it. However, he also testified that he did not know how far ahead the Ohlsen car was at the time of the accident or just before the accident.

In a previous deposition Herring had testified that there might have been more than three hundred feet between the Ohlsen car and the coupe, but that they never were closer than three hundred feet. At the trial Herring testified that the statements in his deposition were true. The hour was about 1:15 P. M. The day was sunny and windless. The dust hung low over the road. Herring testified that he was looking ahead and was paying attention to where the car was and the way it was being driven. Herring never saw the approaching truck until it was about forty feet away, when he said it appeared in the dust. He said at that time it was fairly dusty and that before that "it was in the dust; you couldn't see it." He further testified:

"A. The front end was pretty well on its side of the road but the bed was extended—well, it was at a slant so it was over on our side of the road.

"* * *

"Q. * * * did you see the truck at an angle across the middle of the road before the accident?
A. Yes."

He added that at the time he saw the truck, the coupe was "Considerably on our side." He also testified: "Well, we wasn't square in the middle of the road. We was—we might had one wheel towards the center, but we wasn't all the way in the middle. We wasn't driving right in the middle of the road." He also testified:

"Q. And all times up to before this accident happened and at the time of the accident the car you were riding it was on your own side of the road, wasn't it? A. Yes."

Herring was rendered unconscious by the collision and was in a daze for forty-eight hours thereafter. He remembers nothing after seeing the truck at a distance of forty feet.

Ohlsen, the driver of the first south-bound car was maintaining a speed of approximately forty-five miles an hour on the hard surface road, and the coupe was following at about the same speed. However, when Ohlsen hit the gravel road his speed was reduced to about thirty miles per hour. He did not see the coupe after hitting the gravel road. He said, "we couldn't see them for the dust." We presume he referred to his view in the rear-view mirror. Herring testified that shortly before the collision the coupe was going between thirty-five and forty miles per hour.

Ortman, the truck driver, testified that as he drove the truck northerly onto the straightaway he passed a vehicle, (presumably the Ohlsen car) a few seconds before the collision and that there was some dust. He passed that car "probably a city block and a half" south of the scene of the collision. To him, the dust seemed to be going to the west. Ortman first saw the coupe when it was about three hundred feet away and making a left-hand curve at the northerly end of the

straight stretch of road on which the collision occurred. When the coupe and truck were one hundred feet apart, Ortman thinks there was no dust to impair vision. Ortman testified as follows:

"Q. * * * Are you able to tell the jury what the speed of the Pontiac was? A. Not exactly, no.

"Q. Can you give any estimate? A. Well, they were going awful fast. I wouldn't say how fast."

The answer was stricken on motion of defendant. The testimony continued:

"Q. (Mr. Marsh continuing) How long did it take for this accident to happen from the time you saw the Pontiac come around the turn at three hundred feet? A. Probably two seconds, or about.

"Q. And are you able to—would you say that the Pontiac was going ten miles an hour or sixty miles an hour, or can you fix any speed as an estimate? You are allowed to estimate it. A. Well, I would say it was going nearer fifty miles an hour than anything."

A motion to strike was denied. Thereafter the following transpired:

"THE COURT: There isn't any question about his testimony; he did estimate the speed yesterday at fifty miles per hour.
"* * *

"Q. (Mr. Oppenheimer continuing) That would be your same answer now? A. Yes."

The witness Ortman said that he was driving his truck in a northerly direction, not over twenty miles per hour. His wheels were in the two easterly tracks previously mentioned and he remained in them. He was driving with his right wheel within eighteen inches of his right-hand side of the road. The Pontiac, when rounding the curve which led to the straightaway, was

driving on its left-hand side of the road and was also in the two easterly tracks. The collision occurred about two hundred feet south of the curve. When Ortman first saw the coupe, he said it was headed straight for him. He continued:

"Q. Well, that was three hundred feet away? A. Yes, that is it.

"Q. Now, when it got up closer to you, say within one hundred feet of you, as I understand your testimony it was in the two tracks on the west side of the road, is that right? A. No.

"Q. Where was it at that time? A. On the east side of the road when it come around this turn.

"* * *

"Q. When it was one hundred feet away from you where was it in relation to these tracks? A. Well, it straightened itself out and it was in the center track and the right track.

"Q. Its right track? A. Yes.

"Q. All right. And that—would that be true when it got within one hundred feet of your truck? A. Yes."

Thus, there is evidence that both cars had their left wheels in the middle track as they approached the point of impact. The truck remained in its two tracks without change of direction. There is evidence that the coupe continued without change of direction and the inevitable happened. However, while illustrating the events on the blackboard, Ortman testified:

"Q. Now, where was the other truck [car?] in relation to those tracks? A. You mean when I first seen it?

"Q. No, right up to the time, just before you hit. A. It was right here.

"Q. Well, did it have its wheels in two of these tracks? A. Well, them tracks—I wouldn't say it did or didn't. I wouldn't know.

"Q. I see. Anyway, you had your wheels, the left wheels were in the center track and the right wheels were in the outside track? A. Yes.

"Q. All right. That is what I want to know. And from the time you first saw the other car you kept your wheels in those tracks at all times, is that right? A. Yes.

"* * *

"Q. (Mr. Oppenheimer continuing) Was the car, the car that came towards you, was it on your side of the road or the easterly half of the highway at the time of the collision and immediately before? A. Well, it was on the east side when I first seen it and as it got to the truck, as I say, that corner straightened out enough so it cleared the front end of the truck.

"* * *

"Q. (Mr. Oppenheimer continuing) Assuming that there was a center line here—you understand what I mean—splitting this nineteen feet; is that clear to you? A. Yes.

"Q. Now, you were on your right-hand half of that center line. A. Yes, sir.

"Q. And were you on that right-hand half, or the easterly half at all times? A. Yes, sir.

"Q. All right; now, were you in that position at the time of the actual impact with—A. Yes.

"Q. —with the car? A. Yes.

"Q. I see. Now, as the car approached you, and you say it was coming down the middle, where was the car that ran into the truck in relation to that imaginary center line? A. It was straddle of it if there was a yellow line there."

However, Ortman also testified:

"Q. Now, at the moment of the impact I think you said you didn't observe very clearly exactly what did happen, isn't that right? A. I don't think anybody could.

"Q. No. Right at the time of the accident you, of course, were excited and you couldn't tell exactly where it was at the time of the impact itself; that is true, isn't it? * * * A. I don't think anybody could tell exactly where it was.

"Q. (Mr. Kester continuing) Well, you didn't certainly know, did you? A. No."

He also testified:

"Q. Now, this roadway, except for these tracks, is loose gravel, isn't it? A. Yes.

"Q. It's rough. A. It's rough from the loose gravel, yes.

"Q. Yes, rough from the loose gravel so that it's difficult to drive a car on loose gravel as compared with the beaten track, isn't it? A. Yes, that is right."

Two photographs of the truck taken after the collision appear to be the most satisfactory evidence as to the way in which the cars collided. The left edge of the left front fender of the truck is dented, but the left front wheel appears to be undamaged. The left running board is crumpled, and on the projecting left front corner of the flat bed, there hangs a metal portion of the coupe. There is no apparent damage to the front bumper or even to the headlights and none to the cab of the truck. Ortman testified that the main impact caught the corner of the flat bed about six or eight inches in from the outer edge. After the collision the coupe was a mass of twisted wreckage, almost unrecognizable as an automobile. The evidence conclusively shows that the left front and corner of the flat bed on the truck, constructed as it was, of channel iron, literally ripped through the left side of the coupe. After the collision the fender and door and back fender of the coupe "was all hanging right on the corner of this

truck." From the evidence, a fair inference could be drawn that the left front fender of the coupe would have cleared the left front fender of the truck if the coupe, at that instant, had been two or three inches farther to its right. However, it is also clear that the flat bed of the truck is wider than the over-all width of the front of the truck measured from the outside edge of the left fender to the outside edge of the right one, but the evidence does not show how much wider it is. It does show that the bed overhung the rear dual wheels between three and four inches and extended beyond the edge of the cab about a foot. Since the left rear corner of the cab was apparently undamaged, it would appear that if either car had swerved to its right about a foot, or if each had swerved about six inches, the collision might never have occurred.

Other evidence relevant to the issue concerns marks on the surface of the road and position of the two cars after the collision. Wilbur Thomas, a witness for the plaintiff, said the front end of the truck was fairly over on its side of the road but the back end was more to the middle of the road than the front end, but he couldn't say that any part of it was over the middle of the road. Witness Slagoski said that marks started right from the center of the road. He testified:

"A. * * * the front wheel, left front wheel was in the middle of the road and the left hind wheel was shoved from the middle of the road about two feet or so toward the ditch, toward the right-hand side."

The court struck the statement that the car was "shoved" over. Ortman testified that he put on the brakes as soon as he saw the car and that the truck left skid marks, but that no part of his truck, before or

after the collision, was to the left of the center of the road. He testified further:

"Q. Now, the skid mark that you mentioned, that was, as I remember it, was seven feet long that led to the left rear dual wheels as you see it here in the picture, is that right? A. Right here, up to there.

"Q. You speak louder. A. I say, seven feet from the—or from here up to the wheel, about that."

Officer Boyer who made accurate measurements which were undisputed, testified that after the collision the left front corner of the truck was eleven feet ten inches from the westerly edge of the gravel road. He found a gouged-out place in the road about a foot and a half square, the west edge of which was ten feet eight inches east of the west edge of the graveled road. He and his associate officer testified that there was a skid mark from the gouge to the tire of the truck, the distance measured northerly from the gouge being seven feet three inches. There was also a visible skid mark ten feet six inches in length leading northerly up to the gouge. The wreck of the coupe was resting sixty-five feet five inches southwesterly from the gouge and three feet five inches from the west edge of the road. To summarize the evidence of the police officers: starting from a point south of the gouge, a skid mark runs northerly to the gouge a distance of ten feet six inches. The westerly edge of the gouge is ten feet eight inches from the west edge of the gravel road. Since the gravel road was nineteen feet wide, the west edge of the gouge must have been eight feet four inches west of the east edge of the gravel road. The center line of the road, if there was one, would be nine feet six inches from each side, so the westerly edge of the gouge was one foot two inches east of the imaginary center line of the road. From the gouge, a further skid mark, northerly, ended

at the left rear dual wheel of the truck. There is substantial evidence that the gouge was made by the left rear wheel of the truck and that the gouge marks the location of that wheel at the moment of impact, and that therefore, the left side of the rear wheel of the truck was one foot two inches east of the center of the road. Since the bed of the truck overhangs the left dual wheel three or four inches, it may be inferred that the left edge of the bed was on its one-half of the road by a margin of ten or eleven inches. The same evidence substantiates the claim of plaintiff that the coupe was over the imaginary center line at the time of the impact.

The plaintiff's action is governed by the guest statute, O. C. L. A., § 115-1001, which provides:

"No person transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator or caused by his gross negligence or intoxication or his reckless disregard of the rights of others."

That Ellingsworth was at least guilty of ordinary negligence is beyond dispute. The question is whether there is any substantial evidence that the death of Turner was caused by the gross negligence of Ellingsworth or by his reckless disregard of the rights of others. The defendant argues that since the suit is against the estate of a deceased person, it cannot be maintained unless supported by clear and convincing evidence, citing *Scramlin v. Zimmerman,* 173 Or. 143, 144 P. 2d 324. But that rule is not applicable to our present inquiry. If there was substantial evidence of

gross negligence, then it was for the jury to decide, under proper instructions, whether that evidence was clear and convincing.

The task of drawing a line of demarcation separating cases in which there is evidence only of ordinary negligence from those in which there is substantial evidence of gross negligence or reckless disregard is one of the most difficult and delicate tasks imposed upon the courts. This court has repeatedly observed that the statute does not define gross negligence "nor has this court formulated a general definition of the term applicable to all cases." *Ross v. Hayes et al.*, 176 Or. 225 at 238, 157 P. 2d 517. In fact, it has been said that "no general definition of the term, as used in the statute, applicable to all cases, has *or can be found*." *Storm v. Thompson*, 155 Or. 686 at 692, 64 P. 2d 1309. In another case it was said that "The difficulty lies not in the statement of the law, but rather in its application to the particular factual situation involved." *La Vigne v. La Vigne*, 176 Or. 634, 158 P. 2d 557. We recognize both difficulties; that arising from the absence of precise definition, and that arising from the application of a nebulous rule. Notwithstanding this double impediment, the court has held that:

"* * * it is a mistake to suppose that things are not different because a strict line of demarcation cannot be drawn between them." *Monner v. Starker*, 147 Or. 118, 31 P. 2d 1109.

The statute, and the decisions of this court, have imposed upon us the duty of finding that "difference". Instead of adding to the numberless judicial attempts to define gross negligence, we will proceed inductively to trace the line which has been drawn by this court in considering the actual facts of the decided cases. We

will first consider the facts involved in those decisions which have held that there was no evidence of gross negligence although there may have been ordinary negligence.

In *Rauch v. Stecklein,* 142 Or. 286, 20 P. 2d 387, the host driver was operating a car on a slight down-grade at the rate of twenty-seven to thirty miles an hour, and in rounding a right-hand curve which led into a straight-away on an eighteen-foot oiled macadam road, his right wheel got into the loose gravel shoulder. The driver felt the car slip toward the right-hand ditch and made a left turn. He applied the brakes and the car got out of control and skidded across the highway, injuring the guest. No other car was involved. This was a case of mere inadvertence with no evidence of gross negligence. It bears no resemblance to the case at bar.

In *Ross v. Hayes,* supra, the defendant entered an S curve on a twenty-foot wide oiled macadam pavement which was covered with frost for a distance of one hundred or more feet. The defendant did not notice the condition as to frost. He was driving at a rate of forty or forty-five miles per hour and was partly to the left of the center line in rounding the curve. Earlier in the day, and forty-five miles distant from the scene of the accident, he had had difficulty on a snowy portion of the road and had been warned of the danger, but there was no evidence of any protest subsequent to that time. In making the turn the car skidded and came into contact with a truck which was approaching from the opposite direction. The case presents a close question on the facts but the court held that there was no indication of an indifference on the driver's part to the probable consequences of the act, and no evidence

of gross negligence. BELT, C. J., dissented, being of the opinion that the question was one for the jury.

In *La Vigne v. La Vigne,* 176 Or. 634, 158 P. 2d 557, the host driver fainted while operating the car. Clearly there was no evidence of gross negligence.

In *Lawry v. McKennie et al.,* 177 Or. 604, 164 P. 2d 444, the host operator of a truck was driving north on the east side of the highway. A horse and rider were approaching the truck from the opposite direction, also on the east side, but on the shoulder of the highway, which was paved. The truck was going up hill and the horse coming down. There was evidence that the speed of the truck was about forty-five miles an hour. At a point a hundred feet distant from the point of impact, the truck veered from side to side. It did not slow down until it was one hundred feet from the point of impact. The truck driver switched over to the left side of the road as far as he safely could, in view of cars which were approaching from the north. If the horse had stayed on the shoulder there would have been no accident. The truck did not strike the horse. On the contrary, the horse reared up and came down on the cab. This court properly held that there was no substantial evidence of gross negligence.

In *Navarra v. Jones,* 178 Or. 683, 169 P. 2d 584, there was no evidence as to the speed at which the host driver was operating. The mechanism of the car suddenly and unexpectedly gave way and the car crashed into a culvert. It was held that there was no evidence of gross negligence.

In *Callander and Stone v. Brown,* 181 Or. 279, 178 P. 2d 922, the host car was going north toward an intersection at which the driver intended to turn left. On reaching the intersection the operator stopped the

car and then moved slowly into the intersection. At approximately the center of the intersection the car collided with a truck which was traveling south. The day was clear and the pavement dry. The operator of the car gave a signal for a turn, the nature of which was disputed. While in the intersection he traveled at a speed of four miles an hour. This court properly held that there was no evidence of gross negligence, two judges dissenting.

In *Carlson v. Wagberg,* 183 Or. 95, 190 P. 2d 926, the host driver was operating a car at a high rate of speed on a wet pavement, but as he drove up behind a loaded truck which was driving in the same direction at a speed of thirty-five miles an hour, the car slowed down and followed the truck for one-half mile. He then undertook to pass the truck. Only when he had come along side the truck did an approaching automobile come into view two hundred or three hundred feet distant. The host driver sped up to fifty-five miles in an effort to pass the truck and avoid collision with the other car. His car went out of control on the wet blacktop pavement. We held that there was no evidence of gross negligence.

In *Luebke v. Hawthorne et al.,* 183 Or. 362, 192 P. 2d 990, it was conceded that there was no evidence of gross negligence.

In *Baird v. Boyer,* 187 Or. 131, 210 P. 2d 118, the defendant host was driving south on Broadway Avenue in Portland and on an approximate ten per cent downgrade which continued for about two blocks until it leveled off at the intersection with Northwest Hoyt Street. He was driving about forty miles per hour. As he approached the level intersection a truck which had been moving ten or fifteen miles per hour in a northerly

direction toward the intersection, made a left-hand turn into Hoyt Street. The guest exclaimed, "Watch out, you are going to hit that truck." The host said, "I know it", and slammed on his brakes. The guest car struck the right side of the truck with the right front portion of the car. It skidded about twenty-five feet. This court said the defendant "did everything he could to avoid a collision." It was held there was no evidence of gross negligence. This case does not resemble those in which warning was given and ignored. Here the warning was at the instant of peril and all precaution which was then possible was taken.

In *Kudrna v. Adamski,* 188 Or. 396, 216 P. 2d 262, the right wheel of the host car got onto the shoulder of the highway. In the driver's effort to bring the car back onto the pavement, it went out of control and crashed. The question in the case was whether the plaintiff was a guest, but this court said that there was no evidence of gross negligence or reckless disregard.

In *Cowgill v. Boock,* 189 Or. 282, 218 P. 2d 445, the driver was intoxicated.

As will be pointed out, these cases are distinguishable from the case at bar.

We turn to the cases in which the issue of gross negligence was held to be one for the jury. In several of them the conduct of the host driver was so palpably reckless that they throw no light on the close issue in the case at bar.

In *Hartley v. Berg,* 145 Or. 44, 25 P. 2d 932, the defendant had been drinking beer and whiskey; had been warned, and was driving on the left side of the road.

In *Younger v. Gallagher et al.,* 145 Or. 63, 26 P. 2d 783, two cars were racing side by side on a curving

road approaching a blind intersection. The driver was warned.

In *Storm v. Thompson,* 155 Or. 686, 64 P. 2d 1309, the hour was midnight; the driver was unfamiliar with the road; the night was dark; the accident occurred at a sharp right-angle turn; the speed was between forty and forty-five miles per hour; the driver was warned of the approaching curve and that he was driving too fast.

In *Lee v. Hoff et al.,* 163 Or. 374, 97 P. 2d 715, the operator of a motorcycle was driving at a terrific speed, notwithstanding warning, on a paved road with the center line marked.

In *Melcher v. Adams,* 174 Or. 75, 146 P. 2d 354, the car was being driven upon a road on which there were icy patches. It had previously skidded and the driver had been warned concerning his speed.

In *Layman v. Heard,* 156 Or. 94, 66 P. 2d 492, the defendant was driving a car with smooth tires over a road on which there were patches of ice; driving forty to fifty-five miles per hour. In the course of the ride the defendant was warned several times concerning undue speed, and appeared to be "peeved" due to the warning. When the car was proceeding somewhat less than fifty miles an hour the plaintiff warned the defendant of ice ahead. The car spun around on the ice and the injury occurred. The issue was one for the jury.

These are cases in which warning had been given and ignored and thus the evidence directly tended to show a reckless state of mind, but in a number of cases this court has held that the jury, as reasonable men, could have found gross negligence or reckless disregard

although there was no evidence of warning given and disregarded.

In *Smith v. Williams,* 180 Or. 626, 178 P. 2d 710, the driver had been out all night; knew he was likely to fall asleep, but continued driving at 4 A. M., at fifty-five miles per hour on a gravel road. The issue of gross negligence was for the jury.

In *Monner v. Starker,* 147 Or. 118, 31 P. 2d 1109, the hour was midnight; the car was on a down-grade, with speed between fifty and sixty-five miles per hour, on a part of the Pacific highway in Salem over which a large volume of traffic passes. While attempting to pass another car the operator applied his brakes, causing his automobile to skid for a distance of 147 feet; struck a curb, and then skidded 108 feet further. The issue of gross negligence was held to be one for the jury.

The following cases more closely resemble the one at bar.

In *Storla v. Spokane, Portland & Seattle Transportation Co. et al.,* 136 Or. 315, 297 P. 367, 298 P. 1065, the operator of the guest car collided with a motor bus which he was attempting to pass. Just before the impact he was driving with the left wheels of his car upon the gravel shoulder of the road. He turned to the right before his car had completely passed the bus, thereby causing the collision. This court held that there was evidence of gross negligence. There is nothing to indicate that any warning was given or that the speed was excessive.

In *Cockerham v. Potts et al.,* 143 Or. 80, 20 P. 2d 423, a school teacher was driving, with a nine-year-old boy as guest, on a gravel road which connects with a concrete highway at right-angles. Near the intersection there were fences and brush partially obstructing the

view. She was driving easterly on the left-hand side of the gravel highway and onto the paved road when her car collided with a loaded truck which was proceeding in a southerly direction. She drove immediately in front of the approaching truck which she could have seen had she entered the paved highway from the right-hand side of the gravel road. There was no evidence of excessive speed, yet it was held that the issue of gross negligence was for the jury.

In *Herzog v. Mittleman et al.*, 155 Or. 624, 65 P. 2d 384, the car was being driven on a gravel road. The operator lost control of the car which swerved both to right and left and then into a bank at the side of the road. The opinion of this court does not narrate the evidence in detail, nor set forth the speed of the car. In fact, the principal issue was whether it was necessary to prove gross negligence as the basis of recovery. The court, however, did hold that it "could not say as a matter of law that the negligence * * * was not gross negligence." It was indicated that reasonable minds might differ as to the degrees of negligence.

In *Haltom v. Fellows et al.*, 157 Or. 514, 73 P. 2d 680, the host driver was on an ascending grade on a road having patches of ice and approaching a curve. Another car was approaching from the opposite direction. The two cars were not visible to each other until they were approximately 125 or 150 feet apart. The car approaching the guest car had skidded and was partially on the wrong side of the road, but righted itself. The guest car was turned to the right to avoid collision, which it succeeded in doing, but was unable to remain on the pavement and negotiate the curve. There was evidence that the guest car was cutting the corner and was operating at a speed of fifty to sixty miles per

hour. It was held that there was evidence of gross negligence when a car enters an ascending grade flanking a bluff on one side and a declivity on the other, at a speed of fifty to sixty miles an hour, when the view is obstructed and there is ice on the pavement.

The cases which we have briefly reviewed are the most favorable to the contention of the plaintiff of any which we have found.

This court has in the past so carefully explored the issues arising under the guest statute that we consider it unnecessary to discuss the cases cited from other jurisdictions.

■ In harmonizing, so far as possible, the actual rulings on the facts in cases from this jurisdiction, it seems clear that under some circumstances the facts may present a jury question on the issue of gross negligence, although there is no *direct* evidence of a reckless state of mind manifested by warning given and ignored. While undue speed, alone, or driving on the wrong side of the road, alone, or knowledge of conditions rendering such driving extremely hazardous, alone, may not constitute gross negligence or reckless disregard, yet, a combination of these elements in a given case may present a jury question. The element of recklessness may, under some circumstances, be inferred from evidence of the driver's conduct in the light of conditions and of what he must have known. We accept, and will apply the general views as to the nature of gross negligence expressed in *Rauch v. Stecklein*; *Ross v. Hayes*; *Callander and Stone v. Brown*, and *Baird v. Boyer*, all supra. But, we also recognize that the decision in each case must depend upon the particular facts of that particular case. *Herzog v. Mittleman*, supra. The question briefly stated, is whether the operation of the auto-

mobile indicated a mind indifferent to the rights of others, or having those rash qualities exhibited by the foolhardy, or having an "I don't care what happens" attitude. *Baird v. Boyer,* supra. However, this "I don't care attitude" does not necessarily imply a willingness to cause a collision. If that were the test, no one but a would-be suicide could be held guilty of gross negligence, but it surely does imply a foolhardy willingness to incur great hazards.

■■ Applying the rule that the evidence must be considered in the light most favorable to the plaintiff, we must assume that the host car was traveling "nearer fifty miles an hour than anything." After this testimony had been given the trial court stated that the witness had estimated the speed at fifty miles per hour and the witness again stated that that would be his answer. The truck driver had seen the host car three hundred feet away as it approached, and although he said he could not tell exactly what the speed was, he was entitled, under our decisions, to estimate that speed. *Cameron v. Goree,* 182 Or. 581, 189 P. 2d 596; *Snyder v. Portland Traction Company,* 182 Or. 344, 185 P. 2d 563; *Davis v. Lavenik,* 178 Or. 90, 165 P. 2d 277. The trial court did not err in admitting the evidence. Thus we find evidence that the host car was driven over a gravel road where it was rough from loose gravel, and "difficult" to drive on "as compared with the beaten tracks" at a speed of about fifty miles an hour through dust so thick that a person riding in the front seat and paying attention could not see the approaching truck until it appeared in the dust forty feet away, and that the car then continued without changing its course, though it was partly on its left half of the road, and struck the truck, every portion of which was on its own

half of the road. Concerning the operation of motor vehicles through fog, dust and smoke, this court said:

> "It is undoubtedly the law that a driver of a motor vehicle whose vision is obscured by fog or other weather conditions, dust or smoke, must exercise care commensurate with the danger involved. It is common knowledge that it is extremely dangerous to drive through smoke when the vision is almost completely obscured as in the instant case. * * *" *French v. Christner et al.,* 173 Or. 158, 135 P. 2d 464, 143 P. 2d 674.

And again concerning fog we said:

> "* * * Any experienced driver knows that the utmost care must be exercised under such circumstances but that travel can be maintained with comparative safety when such care is exercised by those using the highway. Undoubtedly, the same principles of law apply to smoke." *French v. Christner et al.,* supra.

The principle, as stated, applies equally to dust.

■ Among the cases cited in which this court has held that there was no evidence of gross negligence we find none in which numerous elements have combined circumstantially to indicate reckless disregard of the rights of others such as they do in the case at bar. We hold that there was substantial evidence from which the jury, as reasonable men, might have inferred gross negligence.

■ By his third assignment the defendant asserts that the court erred in receiving into evidence the photostatic copy of a rough drawing made by a police officer. As originally offered, we are advised that the drawing showed a spot on the pavement marked "point of impact". The words were erased; a new photostat made and received, and the jurors were cautioned that they

were not to consider the conclusions of the officer who had not seen the collision. Other evidence clearly established the gouge mark on the road and clearly connected it with the collision. No error prejudicial to the defendant was committed.

■ The last assignment of error raises a serious question. The case was submitted to the jury at 4:20 P. M. The next morning at 1 A. M., and in the absence of counsel for the defendant, the jury returned to the court room and requested further instruction on three points. The first related to contributory negligence. The court advised the jury that such issue was not before them. The second request was for a definition of ordinary negligence. The court then at length instructed the jury as to ordinary negligence, explaining that there was common law negligence, defining it; and negligence as a matter of law, defining it, and saying, "You really have those two kinds, or two forms of negligence." The third request was for further instructions relative to the "matter of speed and the basic rule." The court then instructed the jury that the allegation concerning speed with reference to the truck driver was withdrawn from their consideration. There was in fact no evidence of undue speed by the truck driver. The court said:

> "Now, so far as the defendants Ortman and Mc-Creadys are concerned, I withdrew that allegation of negligence relative to the speed, and that is not for your consideration, so far as Ortman and Mc-Cready are concerned. I did not withdraw that allegation as it pertained to—what is that other fellow's name?
>
> "MR. CUMMINS: Ellingsworth.
>
> "THE COURT:—Ellingsworth, but it was withdrawn as it pertained to Ortman and McCready. In other words, so far as Ellingsworth was concerned, I told you this afternoon that it was a question of

fact for you folks to determine the speed at which he was driving his car and then it was a question of fact for you to say whether or not the speed was greater than was reasonable and prudent having due regard to the traffic, surface and width of the highway and any other conditions then and there existing, and if you find that he was driving at a speed that was reasonable and prudent, then it would not be negligence, but, on the other hand, if you find that he was driving at a speed that was greater than was reasonable and prudent under all of the circumstances then and there existing, it would be negligence.''

The court cautioned the jury not to overemphasize the instructions just given and sent them back for further deliberation.

The court expressly allowed exceptions to all of the parties as to ''each and every instruction which was given to the jury.''

■ Negligent conduct is a part of the sum total which makes up gross negligence, and when a trial court is instructing the jury in a guest case it is not necessarily error to define negligence in one paragraph and gross negligence in another. The rule which requires that the instructions should be construed as a whole will normally be applied, although we think it the better practice for the court in the very instructions which define negligence to caution the jury that negligence alone is not ground for recovery. But, in the case at bar, the midnight instructions did not so much as hint at the existence of any rule concerning gross negligence. The instructions given concerning negligent speed and the basic rule were expressly limited in their application to the driver of the host car. This was done in the absence of counsel for defendant who had no opportunity to suggest to the court the mislead-

ing quality of the instructions. Counsel for defendant had no reason to anticipate that the jury would request or that the court would give further instructions at one o'clock in the morning. There is nothing to show that any attempt was made to notify him of the unusual procedure, or to show that he was not available on call. The statute provides:

> "After the jury have retired for deliberation, if they desire to be informed of any point of law arising in the case, they may require the officer having them in charge to conduct them into court. Upon their being brought into court, the information required shall be given in the presence of, or after notice to the parties or their attorneys." O. C. L. A., § 5-313.

In *Grammer v. Wiggins-Meyer Steamship Co.*, 126 Or. 694, 270 P. 759, it was held that the giving of additional instructions to the jury in the absence of, and without notice to, the defendant or its attorneys, constituted error, though not reversible error. In that case, however, the only information requested by the jury concerned the preparation of the verdict. Not so here. Under the circumstances we are unwilling to hold that the defendant waived his clear right to be present at the proceedings. We hold that the instructions given were misleading and that reversible error was committed.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.